IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHRISTOPHER JACKSON,

   Plaintiff,      No. CIV S-06-2023 WBS GGH P

  vs.

J. WALKER, et al.,

   Defendants.    <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

<u>Introduction</u>

   Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. § 1983.  Pending before the court is defendants' motion for summary judgment, filed on January 30, 2009, to which plaintiff has filed his opposition, after which defendants filed a reply.

   This necessarily tedious motion involves a multitude of alleged observations about unsanitary conditions in the Folsom kitchen(s).  While no one disputes, or should be surprised, about the presence of some rodents around prison food preparation facilities, as this would necessarily be a constant battle, the question of when a problem becomes one of constitutional magnitude, and how much an individual knew, and when, about an institutional problem such that liability should attach, is proven only here with a massive amount of singular observations.  It is difficult to distinguish a disputed fact from a disputed *material* fact.  Plaintiff

1

1  does not assist the adjudication by shotgunning his allegations to every supervisor who had a

2  connection to food service.  Although the undersigned has great doubt that anything in this

3  litigation will improve the food service at Folsom prison, even assuming that it can or should be

4  improved, hopefully, these Findings and Recommendations have mitigated the almost impossible

5  proof problems facing the trial judge and jury.

6  Second Amended Complaint

7          This action, originally filed on September 11, 2006, proceeds on a second

8  amended complaint, filed on April 27, 2007 (docket # 11), as modified by the Order, filed on

9  August 22, 2007 (# 17), dismissing the CDCR,[1] Schwarzenegger, Hickman, Woodford and

10  Dovey as defendants.  Plaintiff is proceeding against the twelve remaining defendants: James

11  Walker, Anthony J. Malfi, D. Leiber,[2] Karen Kelly, Haythorne, Hague, Rodriguez, Ruller,[3]

12  Arndt,[4] Baughman, Bernardino[5] and Alice Smith.

13          Plaintiff contends defendants Walker, Malfi, Leiber and Baughman have

14  implemented a policy of serving food to the inmates of California State Prison-Sacramento

15  (CSPS) in their assigned cells and that the main kitchen at CSPS, where all food is stored and

16  prepared and from which it is transported to individual housing unit kitchens, is supervised by

17  defendants Haythorne, Hague, Rodriguez, Ruller and Arndt.  Second Amended Complaint

18  (SAC), pp. 6-7.[6]  Plaintiff alleges that defendants Haythorne, Hague, Rodriguez, Ruller and

19

20          [1] California Department of Corrections and Rehabilitation.

21          [2] Defendants' counsel spells the name "Leiber," although the service order and at least
    one prison appeal response document represented the spelling as "Lieber."

22
          [3] Defendants have indicated that the correct spellings of this defendant's name is not
23  "Rueller."

24          [4] Apparently misspelled previously by plaintiff as "Arnt."

25          [5] Erroneously named "Raymond."  See Answer, filed on November 30, 2007 (# 33).

26          [6] The pagination referenced is that which appears in the court's electronic case docket.

1   Arndt have been made personally aware of unsanitary conditions and handling of food, since as

2   early as January 9, 2003, but have done little to enforce health and safety standards.  Id., at 7.

3   Plaintiff states that Haythorne, Hague, Rodriguez, Ruller and Arndt had known for years before

4   plaintiff's arrival about rats/rodents nesting and mating in the CSPS main kitchen and have only

5   responded by setting "stick traps" throughout the main kitchen to hope to control rodent

6   spreading but have continued to allow food storage and preparation there.  Id.

7          Defendants Haythorne, Hague, Rodriguez, Ruller and Arndt were personally

8   aware of dozens of inmate complaints about correctional staff not adhering to health and safety

9   standards in food handling and service such as the stacking of bread racks used to transport food

10  trays on the floor and the use of the food cart as a cart for sheet exchange and to transport other

11  supplies during non food service hours without either the racks or cart being cleaned before being

12  used during food service.   Id., at 7-8.  Despite numerous memoranda issued related to the

13  stacking of bread racks, correctional officials continued to defy health and safety standards.  Id.,

14  at 8, Exhibit (Exh.) A.

15          Plaintiff recounts inmate appeals he filed in 2005, complaining of, inter alia,

16  inmates being allowed to handle food who were not medically cleared to do so; although assured

17  that this would not recur, prison officials continued to defy health and safety standards.  SAC, pp.

18  8-9, Exhs. B, C, & D.  Plaintiff believes that Inmates Henry, #P-64498, and Douglas, #H-53369,

19  who were assigned jobs in the main kitchen bakery, discovered rats/rodents trapped or otherwise

20  during their morning hour assignments.  Id., at 9.

21          Plaintiff was assigned to the main kitchen bakery on around January 5, 2006, and

22  personally witnessed the rat/rodent main kitchen infestation.  SAC, p. 10.  Plaintiff saw that food

23  stored in the dry goods room was accessible to rodents, as was food that was cooked and left out

24  for overnight cooling.  Id.  Plaintiff began to advise inmates not to eat certain foods.  Id.

25          Inmate Wright, #J-67360, was treated for severe food poisoning after eating

26  prison food a day or two earlier; after he discovered multiple numbers of CSPS inmates "treated

for exposure to food poisoning," Wright initiated a group inmate appeal asking that all rats/rodents in the main kitchen be eliminated, which appeal was "obstructed, ignored and denied" as a result of defendant Walker's refusal to protect inmates' health. Id., & Exh. E.[7]

Plaintiff alleges that on November 8, 2005, plaintiff submitted a medical request because he had gotten very sick after eating prison food; he was seen by a doctor on November 16, 2009, and was prescribed medication; he was seen again on November 29, 2005, for the same problem, involving stomach cramps, vomiting and diarrhea and was diagnosed with food poisoning and prescribed additional medication. SAC, pp. 10-11. Plaintiff submitted more medical requests, on April 16, 2006, on April 25, 2006, and on May 1, 2006, regarding the same types of symptoms after eating prison food, and on April 19, 2006, as to the earliest of these requests, was seen by R.N. Cunningham (not a defendant) and given over-the-counter medication; as to the April 25, 2006, request, which plaintiff submitted saying that these medicines did not work, plaintiff was seen by non-defendant Dr. Duc, who prescribed plaintiff food poisoning medication and told plaintiff that there had been a number of food poisoning cases recently. Id., at 11. Plaintiff was seen for food poisoning again on May 10, 2006, and prescribed medication, after indicating, on May 1, 2006, that he had yet to receive his prescription. Id., & Exh. F.

Plaintiff recounts an interview between defendant Rodriguez and Inmate Williams on April 14, 2006, on a complaint filed by Williams on March 2, 2006, in which plaintiff contends that Rodriguez told Williams he had been working at CSPS for 15 years and that during that period there had always been rats/rodents in the main kitchen, which were controlled by "sticky traps," asking Williams to withdraw his appeal. SAC, p. 11 & Exh. G. Williams allegedly asked how the rat/rodent problem could be considered under control when, on March 24, 2006, rat/rodent feces and bite marks were found in up to a dozen pans of iced cake left out to

---

[7] The court notes the exhibit shows the appeal was partially granted by defendant Walker at the second level.

cool the evening before. SAC, pp. 11-12. Defendant Rodriguez denied this, despite Correctional Cook I Cronjager's (not a defendant) declaration that he had personally reported the event to defendant Rodriguez, his supervisor. SAC, p. 12 & Exh. H. Plaintiff relates various steps taken by Williams to bring attention to the infestation problem: his contact with the ACLU on January 15, 2006; filing a grand jury complaint in Sacramento County on March 2, 2006; writing to U.S. Senator Dianne Feinstein on March 1, 2006; writing to the state Department of Health Services on March 1, 2006; writing to the Office of the Inspector General on March 15, 2006; contacting defendant Walker who forwarded his letter to a correctional sergeant (who told Williams since he did not work in the main kitchen he could not help him due to his lack of personal knowledge; nor have Williams' other efforts been availing to date). SAC, pp. 12-14 & Exhs. J, K, L, M, N, & O. Plaintiff also recounts, on information and belief, that Inmate Henry encountered a large rat in the main kitchen on March 4, 2006. SAC, p. 12, Exh. I.

Plaintiff contends that defendant Kelly, CSPS Health Care Manager has been deliberately indifferent to the conditions complained of. SAC, pp. 3-4, 14. He claims that each named defendant has "obstructed, ignored, and denied the existence of rats/rodents" in the CSPS main kitchen, as well as other food service safety and health concerns for years. SAC, pp. 14-15.

Plaintiff avers that he worked in the CSPS main kitchen between January 1, 2006,[8] and August 30, 2006, and his complaints and requests to defendants Raymond [Bernardino] and Smith, both CSPS Correctional Cooks I, were obstructed or otherwise not addressed. SAC, pp. 5, 15, 20. Defendant Leiber, CSPS Correctional Captain of C-facility, \\\\\

---

[8] Plaintiff at this point actually alleges that he worked in the CSPS main kitchen from January 1, 2005, until August 30, 2006, but 2005 appears to be a typographical error, in that plaintiff earlier alleged he was assigned to the main kitchen in January 2006 (SAC, p. 10), and does not dispute (see below) that he was assigned to the CSPS main kitchen from January 2006 to August 2006. Also at ¶ 15 of his own declaration in support of his opposition to the MSJ, plaintiff states that his employment in the main kitchen occurred between January 5, 2006, and August 16, 2006.

1   denied CSPS inmate appeals[9] regarding the defective food services and violations of health and

2   safety standards, and has been deliberately indifferent with regard to the conditions at issue.

3   SAC, pp. 3, 16-19.  At a July 13, 2006, C-facility Men's Advisory Council meeting between

4   inmates and defendants Leiber, Haythorne and Hague, the high number of CSPS food poisoning

5   cases were discussed and a "sophisticated justification" was offered, but defendant Hague

6   admitted that she had personally witnessed the over-stacking of bread racks during food service

7   and so informed defendant Leiber, also stating that CSPS staff would only adhere to appropriate

8   food service health and safety standards under supervision.  SAC, pp. 17-18.   Defendant Malfi

9   has failed to provide a written response to a citizen's complaint filed by Inmate Williams' mother

10  due to the food poisoning and rodent problem, although a Lieutenant Flint did make a phone

11  contact with her.   SAC, p. 19.

12          Inmate Williams was assigned to the CSPS main kitchen on June 14, 2006;

13  Williams' direct supervisor (non-defendant) D.S. Abellon spoke with plaintiff and Williams,

14  admitting that there was a rat/rodent infestation in the main kitchen and that based on his own

15  training he swore under penalty of perjury that it would take a complete fumigation of the main

16  kitchen to eliminate the infestation.  SAC, pp. 19-20 & Exh. T.

17          Defendant Malfi ignored plaintiff's August and October, 2006, written requests

18  regarding the conditions at issue herein.  SAC, p. 20.  When plaintiff was re-housed in CSPS B-

19  facility, where defendant Baughman is in charge of facility operations and programs, plaintiff

20  observed that Baughman's subordinates were violating the health and safety standards at issue in

21  the instant action, imposing cruel and unusual punishment in violation of the Eighth Amendment.

22  SAC, pp. 20-21.  Defendant Baughman assigned plaintiff's September 21, 2006, inmate appeal

23

24          [9] Plaintiff references herein, inter alia, a group inmate appeal filed by Inmate Stewart, #C-
     88999, which plaintiff participated in, relating to unsanitary food service practices at CSPS C-
     facility, such as food trays served with hair in the food, the handling of food trays with
25   contaminated gloves, stacking bread tray racks too high after throwing them on the floor when
     food was served, allowing unauthorized or not medically cleared inmates to serve food.  SAC,
26   pp. 16-17.

1  asking for compliance with health and safety standards and regulations, to a Sergeant Baxter (not

2  a defendant) who white-washed the investigation on Baughman's behalf.  Id., at 21.  Plaintiff

3  alleges a violation of the Eighth Amendment as to all defendants, and asks for injunctive and

4  declaratory relief, as well as money, including punitive, damages.  SAC, pp. 20-25.[10]  The

5  specific allegations he sets forth as violations of the Eighth Amendment are that: the cell-feeding

6  policy, practice or procedure violates California's Health and Safety Code; acting with deliberate

7  indifference in the refusal to exterminate rats/rodents from the prison main kitchen from the first

8  notice and continued withholding of acknowledgment of the problem's existence and with regard

9  to annual health inspections, and by allowing the rats/rodents to continue breeding; obstructing,

10  ignoring, denying inmate grievances concerning prison officials' defiance of health and safety

11  standards in food handling and service; failure to implement an adequate self-evaluation plan

12  related to food service; failure to remedy the conditions imposing cruel and unusual punishment.

13  SAC, p. 23.  __

14  Motion for Summary Judgment

15          Defendants set forth as grounds for their summary judgment motion that: 1)  the

16  conditions of which plaintiff complains were not sufficiently serious to amount to a

17  constitutional deprivation; 2) even if the conditions were objectively serious, defendants did not

18  ignore any alleged violations, but instead took corrective measures to address any lapses in the

19  food service at CSPS; 3) there is no medical evidence that plaintiff contracted food poisoning or

20  suffered any harm from eating the food at CSPS; 4) plaintiff has no evidence that defendants

21  Kelly, Leiber, Malfi, and Walker participated in or failed to prevent any alleged violations to

22  assert a supervisory liability claim against them; and 5) defendants are entitled to qualified

23  immunity because there was no constitutional violation and defendants acted reasonably in

24  _____

25  [10] Plaintiff asks for judicial notice of a Sacramento Bee article, related to a CSPS food poisoning outbreak that allegedly was published "January-July 2006."  SAC, pp. 25-26.  At a minimum, plaintiff would have to be more precise as to when the article was printed before the

26  court could consider his request.

1  addressing inmate complaints about the food service at CSPS.  Motion for Summary Judgment

2  (MSJ), p. 2.[11]

3              *Legal Standard for Summary Judgment*

4              Summary judgment is appropriate when it is demonstrated that the standard set

5  forth in Fed. R. Civ. P. 56(c) is met.  "The judgment sought shall be rendered forthwith if . . .

6  there is no genuine issue as to any material fact, and . . .  the moving party is entitled to judgment

7  as a matter of law."  Fed. R. Civ. P. 56(c).

8              Under summary judgment practice, the moving party

9              always bears the initial responsibility of informing the district court
           of the basis for its motion, and identifying those portions of "the
10             pleadings, depositions, answers to interrogatories, and admissions
           on file, together with the affidavits, if any," which it believes
11             demonstrate the absence of a genuine issue of material fact.

12  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986).  "[W]here the

13  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

14  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

15  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

16  after adequate time for discovery and upon motion, against a party who fails to make a showing

17  sufficient to establish the existence of an element essential to that party's case, and on which that

18  party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.  "[A] complete

19  failure of proof concerning an essential element of the nonmoving party's case necessarily

20  renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be

21  granted, "so long as whatever is before the district court demonstrates that the standard for entry

22  of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at 2553.

23              If the moving party meets its initial responsibility, the burden then shifts to the

24  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

25

26      [11] As noted, only the court's electronic docket page numbering is referenced.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11, 106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255, 106 S. Ct. at 2513.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

party "must do more than simply show that there is some metaphysical doubt as to the material

facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S.Ct.

1356 (citation omitted).

On August 6, 2007 (docket # 16), the court advised plaintiff of the requirements

for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v.

Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc),  cert. denied, 527 U.S. 1035 (1999), and

Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

### *Undisputed Facts*

The following facts set forth as undisputed by defendants are either expressly

undisputed by plaintiff, or are putatively, but not materially, disputed; that is, they are disputed

only to the extent that he seeks to modify the fact as presented without actually disputing the

truth of the fact as set forth.  Where plaintiff seeks to add a caveat to a fact defendants assert to

be undisputed without challenging the essence or materiality of the fact, the court deems that fact

to be undisputed but includes plaintiff's asserted qualification.   Relevant facts, disputed or

undisputed, pertaining to the individual defendants are set forth below under the individual

defendant's name.

Plaintiff has been incarcerated at California State Prison-Sacramento (CSPS)

since March 1995.  Plaintiff worked in the CSPS main kitchen from January to August 2006.  He

was assigned to the bakery for approximately four months, then he was a distribution clerk until

August 2006, and has not worked in the main kitchen since August, 2006.   Plaintiff also worked

in two satellite kitchens in C-yard and a kitchen in B-yard.   He has never worked in any of the

kitchens in A-yard.  As a pantry kitchen worker, plaintiff prepared sack lunches, worked on the

serving line putting food on trays, helped off load deliveries, counted trays, and reheated and

cooked food.  The last time plaintiff worked in a satellite kitchen was around June or July 2007.

1    Plaintiff did not work in the food industry, nor did he take a course or training in food service,

2    before being incarcerated.  Plaintiff is not claiming that being fed in his cell is unconstitutional.

3    Dr. Hooper (not a defendant) did not diagnose any inmate at CSPS with food poisoning in 2005.

4            During the winter of 2005 to 2006, rodents were coming into the main kitchen and

5    other buildings throughout the prison because of the heavy rain fall.  (Plaintiff does not

6    specifically dispute this but claims rodent "infestation" has been a long-standing issue at CSPS).

7    Vector control took corrective measures by laying down traps.  (Plaintiff does not deny this, but

8    claims that such efforts were inadequate).

9            In support of DUF[12] 3, defendants cite plaintiff's deposition for the fact that

10   plaintiff baked pastries and worked the ovens in the bakery, and that as a distribution clerk, he

11   prepared paperwork, menus, and tabulated servings.  Plaintiff's deposition, vol. 1 at 15:16-21 &

12   25:5-26:3.  Citing some of the same portions of his deposition, as well as 17:13-20, his

13   declaration at ¶¶ 9-10, plaintiff avers that he had additional responsibilities, including retrieving

14   ingredients from dry goods storage and supplementing/substituting food items for food that was

15   inedible or contaminated.   The court notes that during the approximately four months that

16   plaintiff worked in the main kitchen bakery, plaintiff's Dep. 15:22-25, plaintiff asserts he had

17   occasion to go to all areas:

18           Q.  And other than the pantry kitchen, what other areas of the main
             kitchen had you been to?
19           A.  Every location: production; the production location; the butcher
             shop, which is adjacent to the bakery; the dry goods storage room
20           where the ingredients for the cakes are located; the freezers, the chill
             blasts; the supervisor's office; the scullery; the back dock.
21

22   Plaintiff's Dep. 16:16-23.

23           As to DUF 5, wherein defendants state that while plaintiff was never assigned to

24   work in the main kitchen back dock area, he would go to the area on occasion to retrieve or drop

25   _____

26           [12] Defendants' Undisputed Fact.

off food items, citing plaintiff's Dep. at 22:7-23:6, plaintiff takes issue only with the phrase "on occasion," maintaining that his visits to the back dock area were numerous and daily, citing in addition to the deposition portion relied on by defendants, his Dep. at 25:21-26:3.  It is not entirely clear whether plaintiff maintains that his trips to the back dock area occurred while he was in the bakery or after his assignment as distribution clerk, but he does assert that he had to go to the back dock area to ship out prepared food and to pick up food for delivery.  Plaintiff's Dep.: 22:9-12.

In DUF 10, defendants maintain that plaintiff complains about the food service at CSPS in 2005 and 2006, alleging that: food had foreign particles in it; dirty bread racks and rolling carts were used during food service; food trays were not covered; inmate servers were not wearing gloves and hats; non-medically cleared inmates were handling food; and rats and rodents were present in the main kitchen, contending that as a result of these violations, he contracted food poisoning, citing his SAC, ¶¶ 19, 20, 27, 40 & 46; plaintiff's Dep. at 36:22-38:19.  Plaintiff does not dispute any portion of this summary, but contends that his allegations are broader in that he also complains about defendants' alleged refusal to develop and implement policies and procedures preventing cooked and stored food from contamination by rat/rodent infestation; that staff and inmates were inadequately trained with regard to cross-contamination; that food storage was not adequate to prevent rat/rodent access; that contaminated food was fed to inmates, not disposed of; that defendants failed to correct and eliminate health and safety issues raised in 2002 and 2003; that defendants failed to enforce health and safety codes, citing, inter alia, extensive portions of the SAC, California Health and Safety Code sections and his own declaration.

In DUF 11, defendants set forth that plaintiff does not claim that food trays were being stacked on top of each other.  Plaintiff's Dep. at 40:13-16.  Plaintiff cites his SAC, Exhs. A-D & R (see above), his own Dep. at 40-4-12; Cal. Health & Safety Code §§ 114067,[13]

---

[13] This section, part of the California Retail Food Code (CRFC), addresses satellite food service restrictions and requirements.

1    113984[14] and his declaration in dispute, stating that he does contend that uncovered food trays

2    were placed on bread racks, which bread racks were stacked on top of each other, allowing dirt

3    from upper bread racks to fall into lower uncovered food trays.  Plaintiff in his deposition does,

4    however, concede that food trays, as opposed to bread racks, were not literally stacked on top of

5    each other; thus, the literal truth of this fact is undisputed.[15]

6              In DUF 13, defendants state that plaintiff's claims regarding the presence of

7    rodents is limited to the main kitchen.  Plaintiff's Dep. at 44:20-25.  Plaintiff's quibbling as to

8    whether he asserts that the rats/rodents infested the main kitchen, rather than simply asserting

9    their presence in the main kitchen, does not dispute the substance of this assertion, which is that

10   plaintiff did concede that his complaint as to rats and rodents only goes to their being found in

11   the main kitchen:

12        Q.  .................................................................................
                 Are you claiming that there were rat [sic] and rodents in the
13        main kitchen and the satellite kitchens, or only in the main kitchen?
          A.      Only the main kitchen.  I don't know if there was in the
14        satellite kitchen, but I'm complaining about the rat and rodents that
          I seen in the main kitchen.

15

16   Plaintiff's Dep. at 44:20-25.

17             In DUF 14, defendants set forth that when plaintiff worked in the main kitchen,

18   plaintiff spoke, on a number of occasions, with Rick Marcos (also known as Rick Ambriz) from

19   vector control at CSPS, about the presence of rodents, who informed plaintiff that he was putting

20   down traps, and plaintiff saw the plastic traps around the main kitchen.  Plaintiff's Dep. at

21   _____

22        [14] This section of the Cal. Health and Safety Code, also encompassed within the CRFC,
     speaks to food preparation and safety requirements, including that food is to "be prepared with
23   suitable utensils and on surfaces that, prior to use, have been cleaned, rinsed, and sanitized as
     specified in Section 114117 to prevent cross-contamination."  Cal. Health and Safety Code §
24   113984 (d).  (Section 114117 sets forth "[c]ircumstances and times requiring cleaning of
     equipment food-contact surfaces and utensils."

25        [15] To the extent, however, that defendants may have intended that plaintiff thereby
     concedes that the food trays were not contaminated by the stacking of bread racks, the court
26   would find any such issue to remain disputed.

46:3-47:2.  Plaintiff seeks to dispute this assertion with his declaration that Ambriz also told him that a rat/rodent infestation could result from two rats within a six-month period and that CSPS or CDCR did not want to spend the money to fumigate the main kitchen to exterminate the rodents.  Plaintiff's Declaration (Dec.) ¶ 44.  However, even if true, this does not dispute the fact asserted by defendants to which plaintiff testified at his deposition, whether or not plaintiff found the traps inadequate.

*Eighth Amendment Legal Standard*

"'Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation.'" Somers v. Thurman, 109 F.3d 614, 623 (1997), quoting Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 1000 (1992) (omitting internal quotations and citations).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970 (1994).

However, "[p]rison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety." Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000), citing, inter alia, Farmer v. Brennan, 511 U.S. at 832, 114 S. Ct. 1970; Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir.1982) ("[A]n institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety" [internal quotations omitted]). When an inmate has been deprived of necessities, "the circumstances, nature and duration of a deprivation...must be considered in determining whether a constitutional violation has occurred." Johnson, supra, at 731.  "The occasional presence of a rodent is

14

insufficient to establish the objective component of an Eighth Amendment claim, which requires that a deprivation be sufficiently serious," Tucker v. Rose, 955 F. Supp. 810, 816 (N.D. Ohio 1997); however, "'a lack of sanitation that is severe or prolonged can constitute an infliction of pain within the meaning of the Eighth Amendment.'" Johnson, supra, at 731, quoting Anderson v. County of Kern, 45 F.3d 1310, 1314, as amended, 75 F.3d 448 (9th Cir. 1995). In Somers, supra, the Ninth Circuit cited a Seventh Circuit case, French v. Owens, 777 F.2d 1250, 1255 (7th Cir. 1985), wherein it was observed that the Tenth Circuit, in Ramos v. Lamm, 639 F.2d 559, 570-71 (10th Cir. 1980), has noted that the state is obligated to provide "'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it,'" and determined that "the state health code, while not establishing 'constitutional minima,' is relevant in making a finding regarding the constitutionality of existing conditions."

> Inmate workers are not given basic instruction on food protection and food service sanitation.[ ] Consequently food items are stored on the floors of walk-in storage compartments and food is often left uncovered allowing the rodents and roaches to contaminate it. Food products which can support food borne diseases are not properly stored and are often left out at room temperature. Food preparation surfaces and cooking equipment are not properly cleaned and therefore provide areas for significant bacterial growth. Food, when it is being served to inmates, is kept at substandard temperatures due to the improper use of the available equipment.

Ramos, supra, at 571.

In that case, the Tenth Circuit court noted that the Colorado Department of Health had found the prison's food service substantially deficient and that the record "amply" supported "the district court's findings and conclusions that the conditions in the food service areas ... are unsanitary and have a substantial and immediate detrimental impact upon the health of the inmate population." Id., at 571-72.

> *Some* conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that

15

1    produces the deprivation of a single, identifiable human need such
2    as food....

3    Wilson v. Seiter, 501 U.S. 294, 304, 111 S. Ct. 2321, 2327 (1991)[emphasis in original].

4    [I]n order to prevail and recover damages against any of the named
     prison officials, the inmate[] in this case must prove (1) that the
5    specific prison official, in acting or failing to act, was deliberately
     indifferent to the mandates of the eighth amendment and (2) that
6    this indifference was the actual and proximate cause of the
     deprivation of the inmate['s] eighth amendment right to be free
7    from cruel and unusual punishment.

8    Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988).

9           Plaintiff cites, inter alia, Hoptowit v. Spellman, 753 F.2d 779, 783 (9th Cir. 1985),

10   for the finding that vermin infestation was "a condition inconsistent with the adequate sanitation

11   required by the Eighth Amendment."  Opposition (Opp.), p. 8.  Defendants point out that in that

12   case the infestation was found to be throughout the prison and was also evaluated in light of

13   other sanitation hazards, "such as standing water, flooded toilets and sinks, and dank air" such

14   that it constituted "an unnecessary and wanton infliction of pain proscribed by the Eighth

15   Amendment."  Reply, p. 2, citing id.

16          Defendants note LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1993).  MSJ, p.

17   8.  In LeMaire, supra, the Ninth Circuit observed that Eighth Amendment requisites are met

18   when "prisoners receive food that is adequate to maintain health; it need not be tasty or

19   aesthetically pleasing."   "'The fact that the food occasionally contains foreign objects or

20   sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation.'"

21   Id., quoting Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985).   In Islam v.

22   Jackson, 782 F. Supp. 1111, 1113-1115 (E.D. Va. 1992), cited by defendants (MSJ, p. 8), the

23   court found that one instance of being served contaminated food and thirteen days of being

24   served food under unsanitary conditions was not sufficiently serious to rise to the level of an

25   Eighth Amendment violation.   Plaintiff points to Grubbs v. Bradley, 552 F. Supp 1052, 1128

26   (D.C. Tenn. 1982), wherein that district court found the lack of sanitation in certain prison

kitchen and food areas "appalling," observing that "inmates forced to eat the food prepared and served under those conditions face a constant risk of contracting any number of food-borne diseases."  Opposition (Opp.), pp. 7-8.  Defendants counter that in Grubb, supra, the court did not hold that therein the presence of vermin alone amounted to an Eighth Amendment violation and that the court there found multiple unsanitary conditions.  Reply, p. 3. Defendants cite a Fifth Circuit case wherein a single mass food poisoning incident, without serious or permanent injury, does not state a constitutional deprivation.  MSJ, p. 2, citing George v. King, 837 F.2d 702, 705-706 (5th Cir. 1988).  To which plaintiff counters that he is alleging frequent instances for which prison officials failed to provide remedial measures.  Opp., p. 8.  Plaintiff also cites Palmigiano v. Garrahy, 443 F. Supp. 956, 961 (D.C. R. I. 1977), wherein it was found that, inter alia, the prison at issue was "massively infested with cockroaches, rodents, mice, and rats, each of which carries disease throughout the prison."   Defendants point out that a variety of filthy conditions were found throughout the prison in that case.  Reply, p. 3.

Plaintiff relies on Curry v. Scott, 249 F.3d 493, 508 (6th Cir. 2001), for the proposition that a large number of grievances may put defendants on notice such that the claim should survive summary judgment on a claim of deliberate indifference (in a case involving a claim of racial harassment against a guard)).  Opp., p. 11.  Plaintiff also cites Delaney v. DeTella, 256 F.3d 679, 686 (7th Cir. 2001) (subjective element of Eighth Amendment claim satisfied where plaintiff alleges defendants did nothing after "repeated requests" to defendants "and "their knowledge of the potential risk."); see also, Coleman v. Wilson, 912 F. Supp. 1282, 1316 (E.D. Cal. 1995):

> The question of whether a defendant charged with violating rights protected by the Eighth Amendment has the requisite knowledge is "a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence [citation omitted], and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."

*Id.* at 511 U.S. 825, ----, 114 S.Ct. at 1981.[16] The inference of knowledge from an obvious risk has been described by the Supreme Court as a rebuttable presumption, and thus prison officials bear the burden of proving ignorance of an obvious risk. *Id.* at ----, 114 S.Ct. at 1982. It is also established that defendants cannot escape liability by virtue of their having turned a blind eye to facts or inferences "strongly suspected to be true." Id. at ---- n. 8, 114 S.Ct. at 1982 n. 8, and that "[i]f ... the evidence before the district court establishes that an inmate faces an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness." Id. at ---- n. 9, 114 S.Ct. at 1984 n. 9.

The court must address the claims and evidence of the parties as to each defendant to resolve the present motion.

### Disputed Facts

Chief among the facts in dispute is whether or not plaintiff suffered food poisoning as a direct result of the food preparation and or food service conditions complained of in this action. Plaintiff has conceded that the doctor he saw on November 16, 2006, was not Dr. Hooper. Plaintiff's Dec. in Opp., ¶ 9. Plaintiff maintains that he saw Dr. Duc (not a defendant) on Nov. 29, 2005, as well as on April 28, 2006, and on both occasions Dr. Duc diagnosed him with food poisoning. Plaintiff's Dec., ¶¶ 9 & 18. The declarations in support of the MSJ provided by Drs. Hooper and Duc do not resolve the matter because while Dr. Hooper declares that he did not diagnose any inmate with food poisoning at CSPS in 2005, and Dr. Duc maintains that he did not diagnose plaintiff with food poisoning or tell him that he had food poisoning in either Nov. 2005 or April, 2006 (Hooper Dec. at ¶ 6; Duc Dec. at ¶ 7), Dr. Duc does concede that he did diagnose plaintiff with gastroenteritis on both occasions and his statement that "[a] patient diagnosed with gastroenteritis does not necessarily suffer from food poisoning," is not sufficiently conclusive to dispose of the matter. Duc Dec. at ¶¶ 4 & 5. While Dr. Duc states that had plaintiff informed him that he thought he had food poisoning or had he (the doctor)

---

[16] Farmer v. Brennan, supra, at 842, 114 S. Ct. at 1981.

suspected food poisoning, he would have noted it in plaintiff's chart and did not do so in the entries provided, plaintiff adamantly declares that he is sure Dr. Duc told him that he had food poisoning and that the doctor told him that there had been a number of such cases recently when he was seen in April, 2006.  Plaintiff's Dec. at ¶ 18; plaintiff's dep. 60:16-18.

In addition, Dr. Nanaglama (not a defendant) declares that he treated plaintiff on May 10, 2006, for abdominal pain and cramps, discontinued plaintiff's Flagyl prescription and prescribed him Bactrim and Donnatal.  Nanaglama Dec. in support of MSJ at ¶ 4.  Dr. Nanaglama explains that Donnatal is prescribed for the treatment of abdominal cramps, that Bactrim is an antibiotic used as treatment for "a variety of conditions suspected of being caused by an infection in the abdominal area."  Nanaglama Dec. at ¶ 5.  Dr. Nanaglama states that "[p]rescribing Bactrim does not necessarily mean the patient has food poisoning."  Id.  However, in so stating, Dr. Nanaglama does concede an abdominal bacterial infection was indicated and, like Dr. Duc, he does not definitively resolve that plaintiff did not have food poisoning by the use of such conditional language.  The problem, however, for plaintiff is that even though the court may find there remains a fact dispute as to whether or not plaintiff suffered food poisoning, plaintiff does not have, nor is he likely to ever be able to produce, evidence that any such ostensible food poisoning was the result of the unsanitary food preparation or service he seeks to implicate herein.

### *Plaintiff's Exhibits in Opposition*

While defendants object to a number of plaintiff's exhibits on grounds of hearsay, irrelevance and speculation, and lack of authentication, some of the objections are well-taken, but to the extent that declarations are made under penalty of perjury by various inmates as to their personal observations, it is clear that such parties could be called at trial to attest to their observations.  See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (evidence which could be made admissible at trial maybe considered on summary judgment); see also Aholelei v. Hawaii Dept. of Public Safety, 220 Fed. Appx. 670 (9th Cir. 2007).  Moreover, any material

1   contained in plaintiff's medical record or central file obviously could be authenticated by a

2   custodian of records.

3          Exh. A to the SAC, as well as to plaintiff's Declaration (Dec.) in support of his

4   MSJ opposition (Opp.) is a copy of a January 9, 2003, CSPS memorandum regarding "food

5   trays," apparently authored by Warden Pliler (although signed by "T. Rosario"), which references

6   "numerous inmate complaints regarding cell feeding."  Staff is therein directed not to place more

7   than three food trays on the carrying racks, not to stack or overlap food trays and to "make certain

8   that food is handled and prepared in a safe and sanitary manner."  Any questions regarding

9   procedures are to be directed to C. Hague (also a defendant in this action).

10          In Exh. B to his declaration (as well as to the SAC), plaintiff includes a copy of an

11   inmate appeal he evidently filed on 7/04/05, complaining that food servers in C-facility were not

12   wearing gloves or hats, that food trays were being carried on dirty bread racks which racks were

13   stacked three high, allowing dirt to fall into the lower food trays, that food was not properly

14   heated, was mixed improperly, bruised or damaged.   When the appeal was partially granted at

15   the first level, plaintiff withdrew it.  This appeal, of itself, does not demonstrate defendants'

16   knowledge of the alleged conditions; however, plaintiff includes numerous other exhibits, which

17   the court will set forth herein.  In Exh. D to his declaration in opposition, plaintiff includes a

18   copy of his 11/03/05 grievance, regarding the stacking of bread racks as many as five high, the

19   throwing of racks on the floor where bird feces and other bacteria adhere to the bottoms of the

20   racks, which are re-used to supply food trays without being cleaned.  Defendant Walker signed

21   the second level partially grant appeal response, wherein it appears that plaintiff took issue with

22   the first level appeal response that staff were washing the bread racks to avoid food

23   contamination.  The second level appeal response (subsequently exhausted at the third level),

24   referenced the Jan. 9, 2003, memo regarding not stacking food trays, and appears to have

25   expanded or clarified it as follows:

26   \\\\\

> The memorandum outlining the policy regarding food trays dated
> January 9, 2003, will be adhered to by staff in all housing units
> regarding the stacking of food trays.  The bread racks utilized to
> carry food trays will not be stacked on top of each other to assure
> that contamination of the food items will not take place.

Exh. D to plaintiff's Dec., p. 6.

Exh. E to plaintiff's Dec. includes a copy (arguably insufficiently authenticated) of a health request form evidently from plaintiff, dated 11/08/05.  The request states: "very sick, vomitting, stomach pain, diar[rh]ea.  Need to see doctor.  Think it was something I ate."  These words do appear to be penciled through, as defendants point out in their Reply, and replaced with the words: "requesting copies of chronos."  Copies of physician's order and progress notes are attached, evidently showing plaintiff was prescribed prilosec and antacid on 11/16/05 by Dr. Hooper.  An entry for 11/29/05 notes plaintiff had abdominal pain and diarrhea, diagnosed as gastroenteritis, and was prescribed Flagyl and Kaopectate.

Exh. J, p. 1,  to plaintiff's Dec. is a copy of a health care request form from plaintiff, dated 4/16/06, stating: "Having been very sick, vomitting, diarrhea, stomach cramps. Been in a great deal of pain."  The form indicates the request was reviewed on 4/19/06.

Exh. J, p. 3, to plaintiff's Dec. contains a copy of another health services request, dated 4/25/06, stating that plaintiff needed to see a doctor "A.S.A.P." because he was still vomiting and having stomach cramps.

At p. 6 of Exh. J, is a copy of plaintiff's 5/01/06, health care services request form stating that he had been prescribed medication for food poisoning by Dr. Duc, but had not received the meds and was still suffering from symptoms of vomiting, stomach cramps and diarrhea.

Exh. F, p. 1, to plaintiff's Dec. is a copy of a 3/31/06 declaration sworn to by J. Cronjager, who is identified as a CSPS staff cook in charge of inmate supervision in the C-facility main kitchen/bakery, attesting to his or her observation on 3/24/06 of what Cronjager believed to be rat/rodent feces and bite marks in 8 to 12 sheets of iced cake left out the day before

1  for cooling, attesting as well to having had each contaminated cake sheet disposed of and to

2  having notified defendant Rodriguez of the incident on the day it occurred.

3        Exh. F, p. 2, is a copy of a declaration, apparently signed by a CSPS supervising

4  cook 1, named D.S. Abellon, evidently prepared for another inmate's civil complaint, supporting

5  the claim of an infestation of rats/rodents in the main kitchen and swearing that he/she has

6  personally witnessed rats/rodents at CSPS at various times.

7        Exh. G to plaintiff's Dec. is a copy of a declaration by an inmate named Terral

8  Henry, CDCR # P-64498, signed on 5/03/06, who declares that he has been a bakery scullery

9  worker in the main kitchen since about 12/31/05, and has witnessed rats/rodents living and dead

10  throughout the main kitchen at CSPS, including the dry room storage area, and that supervising

11  cooks are aware of the infestation and the only step taken has been setting "sticky traps" in the

12  kitchen.  He further claims that the rats have daily access to stored and prepared food in the main

13  kitchen, and that on 3/04/06, he reported to his supervisor that a large rat ran across his foot in

14  the main kitchen.

15        Exh. K to plaintiff's Dec. is a copy of an inmate group appeal, filed by an inmate

16  named Glenn Wright, indicating that he had been treated at CSPS on 2/02/06 for food poisoning

17  from food served at the prison, stating that he (Wright) had found hair in his food, that food

18  handlers failed to wear head wear or to change gloves after handling unsanitary items.  Inmate

19  Wright states that "a number of inmates are being exposed to food poisoning...." and complains

20  about reports of rats being found in the C-facility bakery.  In his request for a third level

21  response, on 5/01/06, Wright references the 3/24/06 incident of rat/rodent feces and bite marks in

22  the cake sheets in the main bakery as well as finding "ludicrous" Warden Walker's (a defendant

23  herein) second level appeal response that vector control had eliminated the rat/rodent problem.

24  The appeal appears to have been signed by more than fifty inmates.  Defendant Walker's 4/18/06

25  response indicated that defendant Rodriguez had been assigned to investigate the claims at the

26  second level, acknowledges that heavy rains have resulted in rodents being a problem recently

but that vector control's aggressive response has "quickly eliminated the rodents."  Defendant

Walker also states that "there is no definitive evidence that a food borne outbreak occurred."  The

appeal was denied at the third level.

Exh. L to plaintiff's Dec. is a copy of a 3/02/06 appeal by Inmate Williams,

claiming that he had been diagnosed and treated for food poisoning on 2/17/06, after eating his

dinner meal, and complaining that CSPS had had a food poisoning outbreak due to the main

kitchen's rat/rodent infestation.  He also claims that he has found hair and other items in his food

and tray due to numerous people handling his food because he is served in his cell.  The second

level appeal response appears to duplicate the response to the appeal filed by Inmate Wright, in

that defendant Rodriguez was assigned to review this appeal as well and defendant Walker

makes the same second level appeal response on the same date, 4/18/06, with only the inmate

names changed, and the date of the response changed on one page, to 4/19/06.

Exh. M to plaintiff's Dec. is a grievance, dated 5/23/06, plaintiff complains of

having been treated for food poisoning on three occasions without the conditions causing his

illness having been corrected.  He claims that bread racks are still thrown to the floor, stacked

and the main kitchen still has a rodent problem.  The appeal responses show that plaintiff was

interviewed by defendant Ruller on 7/02/06.  It was claimed that Dr. Duc had not diagnosed

plaintiff with food poisoning on 4/01/06, but with diarrhea, that plaintiff had self-diagnosed, that

there had been no reported cases of food borne illness by the medical department, and that

defendant Ruller indicated that his discomfort could have been a result of how plaintiff prepared

his own food in the cell's confines.  In the 9/20/01 second level appeal response signed by

defendant Malfi, it was noted that defendant Hague confirmed no food poisoning diagnosis in the

medical records on 9/01/06, stated that she was also informed by defendant Leiber (spelled

Lieber) that "the practice of stacking trays has stopped."  It was further stated: "We have a Vector

Control Specialist on call in the Main Kitchen so we don't have a problem with rodents.  We

passed our last environmental inspection June 9, 2006, with flying colors."  Plaintiff appealed to

1  the third level on 10/05/06, claiming a cover up and no real investigation, which appeal was

2  denied on 1/09/07.

3        Exh. N to plaintiff's Dec. is a copy of a 5/31/06 CSPS inmate grievance by Inmate

4  Maurice Campbell claiming to have suffered flu-like symptoms between 5/17/06 to 5/23/06, that

5  he attributed to food preparation/mismanagement, stating that his treatment was delayed due to a

6  food poisoning outbreak that had exhausted the available medical treatment as explained to a

7  correctional officer named Jeffries by an MTA Cordova (or Corona).  In the first level appeal

8  response, the correctional sergeant responding indicates that in a conversation on 7/29/06, an

9  MTA named M. Spinks told him (or her) "an epidemic" had occurred, but that medication had

10  not run out.   The third level response appears to indicate that when a number of inmates reported

11  flu-like symptoms, rumors spread that it was food poisoning, and that his claim that his illness

12  was related to food handling practices was unsubstantiated.

13        Exh. O to plaintiff's Dec. is a copy of plaintiff's 9/21/06 appeal regarding his

14  arrival on B-yard as of 8/18/06 and complaining about violations of food preparation and service

15  policy and procedures by the failure of staff to wear kitchen hats, by stacking of up to five bread

16  racks, by touching contaminated surfaces without changing gloves before serving food, by racks

17  thrown on the floor and then re-filled with food trays and the cart for food being filthy.  Plaintiff

18  claims therein that defendant Malfi has not corrected the procedures.  While asserting in the

19  second level partial grant response [signed by defendant Malfi] dated 11/30/06, that there was no

20  evidence that food service was "inadequate, unsanitary or in violation of any laws," it is also

21  stated that:

22      The institutional expectation is that staff places no more than three
    food trays on a large carrying rack for distribution to the cells.  To

23      ensure proper food handling, staff should not stack or overlap food
    trays.  All dining room staff will make certain that food is handled

24      and prepared in a safe and sanitary manner.  Block staff will ensure
    compliance is met with regards to cell feeding procedures.  Policies

25      and procedures regarding these issues have been and will be
    reiterated to staff and supervisors.  There is currently no plan to

26      assign supervising cooks to all satellite dining rooms.  Supervising

1    cooks are available to assist the dining room officers if needed.

2  Exh. O, pp. 6, 7.

3    Exh. P to plaintiff's Dec. is a copy of plaintiff's inmate appeal, claiming that

4  defendants Haythorne, Hague, Rodriguez, Ruller and Arndt are responsible for main kitchen food

5  preparation, that plaintiff has shown his supervisor, Jochim, bird droppings that cover the bread

6  racks every day because they are left out in the back dock area.  In the first level appeal response,

7  the Corr. Sgt. Murray states that he spoke with C/O Jochim on 6/27//07, who confirmed that

8  plaintiff had told her of the bird feces on the bread racks and that she had spoken with defendant

9  Hague who told her that bread is placed on the racks by an outside vendor.  Defendant

10  Rodriguez, on 6/27/07, assured Murray that he would contact the vendor to make sure no more

11  contaminated bread racks were sent to CSPS.  Plaintiff appealed to the second level and the

12  appeal was partially granted at the second level under the name of defendant Walker.  It was

13  reiterated that the vendor has been told to deliver clean bread racks.  Staff was advised to make

14  sure racks met health/safety standards and were stored where they were not exposed to bird

15  droppings.  Plaintiff's third level appeal, asking, inter alia, for an investigation into the lapse of

16  health and safety standards and for those responsible to be held accountable was denied.

17    Exh. Q to plaintiff's Dec. is a copy of an August 4, 2007, declaration by an Inmate

18  Frank Daniels, CDCR # J-82534, who declares that he was employed as an inmate/cook server in

19  the B-yard satellite kitchen since February, 2007, that he had witnessed bread racks with bird

20  feces delivered from the main kitchen daily, that as of Aug. 4, 2007, the bread racks were still

21  being delivered with bird feces on them.

22    Exh. R to plaintiff's Dec. is a copy of Inmate Maurice Scott's (# J-43336)

23  declaration, signed on Aug. 1, 2007, attesting to the same thing as Inmate Daniels.

24    Exh. S to plaintiff's Dec. is a copy of plaintiff's rejected inmate appeal regarding

25  unsanitary food service and preparation on B-yard, dated 8/03/07, and claiming that tier tenders

26  who are not medically cleared to handle food are doing so.

1        Exh. T to plaintiff's Dec. is a copy of a declaration, signed on 9/20/07 by Inmate

2 Nicholas Green, # P-90250, stating that he worked in the CSPS main kitchen from around

3 2/23/07 and witnessed rat/rodent feces and bite marks on dry goods in the dry goods storage

4 room daily.

5        Exh. U to plaintiff's Dec. is a copy of a declaration from Inmate Chris Curtis, # V-

6 05156,  signed on 10/03/07, stating that he worked in the CSPS main kitchen from around

7 7/07/07, and has seen rat/rodent activity, has seen them stuck in sticky traps "still alive for days"

8 and has seen rat/rodent feces and bite marks on dry goods in the dry goods store room.

9        Exh. V to plaintiff's Dec. is an appeal filed by plaintiff on 1/03/08, complaining

10 again about the apparent continued stacking of bread racks, and their being thrown on the floor,

11 etc.  In the Oct. 21, 2008, third level appeal response, it is noted that the January 9, 2003 memo

12 (mistyped as 2008) on which plaintiff relies so frequently referred to stacking of food trays, not

13 bread racks.  Also contained in Exh. V at p. 13 is a copy of a memo, dated August 9, 2007, from

14 defendant Leiber, with the subject line: "reiteration of policy concerning the feeding of birds

15 within C-facility," demanding that all feeding of the birds within C-facility should stop

16 immediately due to "excessive amounts of bird dropping accumulating in numerous areas of this

17 facility, creating potential health issues."  In Exh. V at p. 15, in a copy of a February 22, 2008,

18 memorandum apparently signed by defendant Haythorne and directed to facilities captains and

19 lieutenants and specific pantry sergeants with regard to the subject "stacking trays," C. Hague

20 (defendant herein) was reported to have recently observed B-facility pantries during morning

21 meal service, noting the stacking of food tray racks "10 high" and with none of the trays covered.

22 Further observing that trays were available to cover the food trays.  The "proper procedure" was

23 clarified [bold in original]:

24          ·The meal tray must be sent to the cells covered.
           · Each rack should hold only 3 trays.

25          · Racks must not be stacked more than 6 high.  **This is a change,**
           **in the past, you could not stack trays at all because of**

26           **contamination of the trays by dirt and food falling from the**

1  **racks above**.
·The racks must be washed after each shift.

2

3  It was added that "[f]ood is covered to keep it hot and free from contaminates."

4  Exh. W to plaintiff's Dec. contains a copy of a 2/11/08 appeal filed by an inmate

5  named Joseph Jackson, #P-14671, complaining of the unsanitary conditions of food delivery to

6  the cell blocks.

7  Exh. X to plaintiff's Dec. is a copy of a 2/20/08 grievance from plaintiff

8  concerning alleged unsanitary food preparation and service.

9  Exh. Y to plaintiff's Dec. is a partial copy of a CSPS group appeal filed in March

10  or April of 2006, complaining of hair in food and unsanitary food service conditions (partially

11  granted at the second level of review by defendant Malfi on June 12, 2006).

12  Exh. BB to plaintiff's Dec. includes a declaration from an inmate named Dean

13  Kilgore, # V31306, signed on 11/07/08, declaring that since his 2004 arrival at CSPS, he has

14  witnessed unsanitary and unhealthy food preparation and service operations which he details

15  therein, including filthy and stacked bread racks and uncovered food trays.

16  Exh. CC to plaintiff's Dec. - a copy of a declaration by Inmate Jaron Brignac,

17  dated 2/06/08, declaring that he is housed at CSPS C-facility and that on 2/02/08, after eating

18  breakfast he became ill and was informed by the medical clinic that he had food poisoning.  In a

19  separate declaration, dated 10/29/08, this same inmate, Brignac, #P-07934, attests to filthy bread

20  racks and uncovered food trays, etc., and that he has witnessed unsanitary food prep and service

21  since his July, 2003 arrival at CSPS.

22  Exh. DD to plaintiff's Dec. is a copy of a declaration by an inmate named Jack

23  Boyle, declaring that he contracted food poisoning so severe in CSPS C-facility in May and June

24  of 2006, that he had to be treated at an outside hospital.

25  Exh. EE to plaintiff's Dec. is a copy of a declaration by an inmate named Markus

26  Tatum, dated 3/08/09, attesting to having attended a meeting as CSPS C-facility men's advisory

27

1 council chairman on 7/13/06, which included, among others, defendants Haythorn and Hague,

2 and stating that he took the minutes of the meeting.  A copy of the minutes are not included with

3 that exhibit, but the minutes are included as Exh. R to the second amended complaint, setting

4 forth that the attendees also included defendant Leiber, as well as others, including the inmate

5 named M. Tatum.

6                    *Defendant Arndt*

7            Defendant Arndt states that he was employed from October 2002 to October 2008

8 as supervising correctional cook II at CSPS.  Defendant Arndt Dec. ¶ 1.  Defendant Arndt states

9 that his duties included "planning, organizing, and supervising the preparation, cooking,

10 distribution, and serving of food to inmates...."; training and instructing employees and inmates;

11 supervision and maintenance of food service equipment, supplies and work areas; reviewing and

12 responding to inmate appeals.  Id.   In DUF 15, defendant Arndt maintains that plaintiff's claim

13 against him stems from Arndt's alleged knowledge of the presence of rodents in the main

14 kitchen, and this defendant's alleged failure to resolve the problem, citing plaintiff's Dep. at

15 141:23-144:17.  Plaintiff does not per se dispute this but claims that his allegations encompass

16 more, i.e., that defendant Arndt, who was aware of the unsanitary food conditions, failed to

17 enforce health and safety standards, permitted contaminated food to be served to inmates, did not

18 dispose of contaminated food; refused to stop the practice of food being left out overnight or

19 implement changes/recommendations provided by Rick Marcos.  Despite supplying voluminous

20 exhibits (see above), plaintiff, in supporting these contentions, relies in part in his response to

21 this and other of defendants' undisputed facts, on discovery documents/responses that he has not

22 included as supporting exhibits to his opposition, or has failed to sufficiently identify.  On the

23 other hand, defendants, while objecting (see Reply, pp. 8-10 & above) both to specific exhibits as

24 well as in a general manner to plaintiff's response to their statement of undisputed facts and his

25 opposition brief argument to the extent that he does not produce evidence in support thereof,

26 does not specifically fault plaintiff's reference to defendants' discovery responses, even though

the court cannot locate them, although some are referenced in plaintiff's deposition.

In any event, as noted above, plaintiff's allegations in the second amended complaint (SAC) with regard to defendant Arndt, as well as defendants Haythorne, Hague, Rodriguez and Ruller, are that they supervised the main kitchen where all prison food is stored and prepared and from which it is transported, were personally made aware of unsanitary food handling and conditions without ameliorating conditions adequately and had known for years about the rodent nesting problem with the only response being the setting of the stick or sticky traps.

DUF 16 is another instance where the defendant logically rests support on an assertion upon plaintiff's deposition testimony at 143:18-144:17, in this instance, that on the two occasions when plaintiff raised the issue of the presence of rodents with defendant Arndt, that Arndt informed plaintiff that something was being done.   Plaintiff again does not actually dispute this point, but asserts that defendant Arndt did not contact vector control on either occasion, that he never saw Arndt talking to vector control or that Arndt did not follow-up with memos or ask to be shown the location of rodent activity.  Plaintiff's putative supporting documentation cited is insufficient to dispute the fact as framed, but defendant Arndt himself recalls that while he did see "at least one" CSPS inmate grievance complaining about food service, rodents in the main kitchen and contracting food poisoning, he does not recall reviewing or responding to any such grievance; on the other hand, he also declares that he reviewed and responded to inmate appeals.  Arndt Dec., ¶¶ 1, 4.  It appears that defendant Arndt, while contradictorily doing so, does at a minimum indicate awareness of the allegations regarding rodent infestation in the main kitchen, especially since he attests that he immediately contacted vector control to lay down traps for rodents when he was told of rodent activity in the main kitchen.  Plaintiff contends that defendant Arndt took minimal action by not disposing of contaminated food or cleaning the affected area or doing a thorough inspection.

\\\\\\

1        Defendant Arndt states that plaintiff never showed or brought to Arndt's attention

2   evidence of the presence of rodents in the main kitchen, for support of which contention,

3   defendant cites plaintiff's Dep. at 144:18-24.  Defendant Arndt swears he never saw rodents or

4   evidence of rodent activity in the main kitchen.  Nor did he see a rodent infestation in the main

5   kitchen when he worked at CSPS.  Defendant Arndt Dec. ¶ 5.  Defendant Arndt also states as

6   undisputed that whenever he was informed by a supervising correctional cook or by an inmate

7   that he had seen a rodent or saw evidence of rodent activity, Arndt immediately contacted vector

8   control, who would lay down traps in the affected area of the main kitchen.  Arndt Dec. ¶ 6.

9        Although plaintiff did respond to deposition questions that he did not specifically

10  present evidence to defendant Arndt of rats or rodents in the main kitchen or show him food that

11  had been rat-bitten, he also maintained that Arndt did know about rats in the main kitchen in his

12  deposition.  Plaintiff's Dep.:145:6-8.  Plaintiff also argues that by speaking to defendant Arndt

13  about the matter, he was bringing the problem to his attention and that sticky traps set out in the

14  kitchen demonstrated the presence of rats/rodents in the main kitchen.  Plaintiff's opposition to

15  statement of facts, p. 8.  Plaintiff further maintains that a memo circulated to all supervising

16  correctional cooks put Arndt on notice as to the infestation and that everyone knew there was a

17  rodent infestation problem going back to 2004.  Plaintiff does not clearly identify or attach any

18  such vector control memo in the evidence presented; however, in his deposition, plaintiff

19  references several memoranda produced by defendants in response to his request for production

20  of documents: a February 9, 2006, memorandum from vector control speaking about the rodent

21  problem in the kitchen, bakery and back dock area, and the sanitation problems therefrom, a

22  memorandum defendants' counsel states for the record was produced as Exh. 13 in response to

23  plaintiff's document production.  Plaintiff's Dep.: 92:10-93:10.  There was a memorandum

24  dated April 3, 2006, directed to "C-Facility cook supervisors" with the subject identified as

25  "[r]odent problem in the bakery of C Facility main kitchen area," which evidently discusses, inter

26  alia, how many rodents are being caught per week, an exhibit which defendants' counsel asks for

1  plaintiff to confirm as defendants' Exh. 15 produced in response to plaintiff's request for

2  production, which he does.   Plaintiff's Dep. 94:20-95:22 & 97:14-18.   Plaintiff points out that

3  defendant Arndt saw evidence of rodent activity insofar as he saw the sticky traps set out for rats,

4  a somewhat circular argument.   In addition, at his deposition, plaintiff stated that defendant Arndt

5  admitted, in addition to the fact that he reviewed inmate appeals, to doing inspections of the main

6  kitchen.  Plaintiff's Dep. at 143:6-13.

7              As noted, defendant Arndt makes clear that he was employed from October 2002

8  to October 2008 as supervising correctional cook II at CSPS.   It is undisputed that vector control

9  laid traps in the main kitchen in response to the rat and rodent problem that defendants conceded

10 at least as to the winter of 2005-2006.  Protestations by this and other defendants (see below) that

11 they never saw evidence of rodent activity during this period while rodents existed throughout

12 the institutional premises appears a somewhat dubious assertion, particularly in the case of such a

13 defendant as this, who may be presumed to have conducted main kitchen inspections in the

14 course of fulfilling his responsibilities.  Whether or not he did see evidence himself, this

15 defendant does not question whether there were rodents present in the main kitchen and the

16 adequacy of simply laying traps is certainly challenged by plaintiff.  Moreover, plaintiff has

17 presented sufficient evidence to show that rats contaminated cakes left exposed overnight in the

18 main kitchen.  Plaintiff's Exh. F, above.  Plaintiff also asserts that he once presented a rat to

19 another defendant (see below) and he argues that the rodent problem has not been subsequently

20 sufficiently ameliorated, at least with regard to the dry goods store room.  See Exhs. T and U,

21 above.   The difficulty for plaintiff, however, is that he cannot adequately support his claim that

22 this defendant did not call vector control when rodent activity in the main kitchen was presented

23 to him, that the failure to do more than that rose to the level of an Eighth Amendment violation,

24 even given the dramatic instance of food contamination that he presents.  Summary judgment

25 should be granted to this defendant.

26 \\\\\

1            *Defendant Haythorne*

2            It is undisputed that defendant Haythorne was the correctional food manager

3   (CFM) at CSPS from April 1994 to January 2009.   Defendant Haythorne states that as CFM, he

4   was responsible for ensuring that food was properly prepared and handled in CSPS kitchens,

5   which included "maintaining proper sanitation levels, monitoring the quality and quantity of

6   production, ensuring proper food handling and storage, and implementing policies and staff

7   training"; he also reviewed and responded to inmate appeals.  Defendant Haythorne Dec. ¶ 1.

8   Plaintiff contends that defendant Haythorne violated health and safety standards which violations

9   resulted in plaintiff getting food poisoning.  Plaintiff's Dep. at 84:16-21.  Plaintiff claims that,

10  when he worked in the main kitchen, he spoke to defendant Haythorne on several occasions

11  about the presence of rodents.  Defendant Haythorne informed plaintiff that "they were doing

12  something about it."   Plaintiff's Dep. at 85:8-88:12.  Plaintiff felt he was getting the brush off.

13  Plaintiff's Dep.: 88:23-89:2.  Plaintiff referenced a memo of a January, 2006 meeting, which

14  included among others, defendants Haythorne and Hague, acknowledged by defendant's counsel

15  as Exh. 17 produced in response to a document production request by plaintiff, wherein problems

16  with rodents in the main kitchen were discussed.  Plaintiff's Dep. 97:25-98:22.   Plaintiff also

17  contends that defendant Haythorne is responsible for the alleged violations that occurred in the

18  satellite kitchens because he was the food manager and he assumes defendant Haythorne knew of

19  the alleged violation in the satellite kitchens because of the inmate grievances filed.  Plaintiff

20  never discussed his concerns about the stacking of racks or the alleged use of non-medically

21  cleared tier porters and tenders.  Plaintiff's Dep. at 88:13-23 & 90:20-91:5.

22            Defendant Haythorne declares that he learned that a couple of inmates at CSPS

23  filed grievances complaining of unsanitary food service conditions, the presence of rodents in the

24  main kitchen, and getting food poisoning.  Defendant Haythorne contacted the medical

25  department to determine whether these inmates had in fact developed food poisoning.

26  The complaints of food poisoning were unsubstantiated.  Defendant Haythorne Dec. ¶ 3.

1   Plaintiff disputes that this defendant only learned of a couple of grievances, referencing

2   numerous inmate grievances filed in 2002-2003 as well and in 2005-2006 regarding unsanitary

3   food service conditions.  Plaintiff's Opp. to DUF, p. 31.

4       Defendant Haythorne maintains that he never ignored or instructed correctional,

5   food services, or medical staff to ignore inmate complaints about food poisoning at CSPS or

6   improper food service in the satellite kitchens.  Defendant Haythorne Dec. ¶¶ 6-7.  Plaintiff

7   maintains that this defendant had notice not only of the main kitchen rodent problem, but also the

8   numerous complaints of health and safety violations in the satellite kitchens.  Plaintiff's Opp. to

9   DUF, p. 32.

10      Defendant Haythorne states that, as CFM,  he has established a policy requiring

11  that all correctional officers receive pantry training as of two years ago to ensure compliance,

12  conceding that before implementing this policy, only those correctional officers assigned to the

13  satellite kitchens received pantry training; thus, when the regularly assigned officer was absent or

14  unavailable, the replacement officer did not necessarily have pantry training, which sometimes

15  caused non-compliance with standard procedures.  Defendant Haythorne Dec. ¶¶ 8-9.  Defendant

16  Haythorne maintains that he also improved the reporting system of the Meal Sampler Report

17  (MSR) and temperature reports.  The MSR system is an opportunity for inmates to complain or

18  provide feedback about the food and food service at CSPS through a random selection of inmate

19  comments at each meal.  Any MSR containing negative comments about the food service is

20  forwarded to the Facility Captains, so the matter can be addressed.  Defendant Haythorne Dec. ¶

21  10.  Plaintiff counters, essentially, that this system was initiated while rodents still infested the

22  main kitchen and it did not address that problem, and that defendant failed to set forth what

23  complaints prompted the MSR system.  Plaintiff's Opp. To DUF.

24      Defendant Haythorne avers that he, on occasion, inspected the various satellite

25  kitchens at CSPS and that during any such inspections in 2005 and 2006, he did not see inmate

26  workers without the proper protective attire, such as gloves and hair nets, or the stacking of food

trays or bread racks, or the use of dirty carts or bread racks, or bread racks thrown on the floor. Defendant Haythorne Dec. ¶ 11.  (Plaintiff has argued that at a July 13, 2006, C-facility Men's Advisory Council meeting between inmates and defendants Leiber, Haythorne and Hague that defendant Hague admitted that she had personally witnessed the over-stacking of bread racks during food service and so informed defendant Leiber, also stating that CSPS staff would only adhere to appropriate food service health and safety standards under supervision.  SAC, pp. 17-18, Exh. R).  Defendant Haythorne states that he was aware of inmate complaints about the stacking of food trays and bread racks at CSPS and he requested tray covers be purchased; "in approximately 2007" the number of food trays were doubled and were then used as covers. Defendant Haythorne Dec. ¶ 12.  To address concerns about the stacking of bread racks during 2005 and 2006, defendant Haythorne states he adopted a policy that racks not be stacked, although this was not a written policy.  After the purchase of food tray covers and with the acquisition of deeper bread racks, a standard operating procedure was implemented permitting the stacking of racks but not more than three high.  Defendant Haythorne Dec. ¶ 13.  The defendant does not clarify when these food tray covers were purchased, and Exh. V, p. 15 to plaintiff's Dec. in opposition (set forth above) indicates there was a still a problem with uncovered food trays, in a memorandum from defendant Haythorne, as late as 2008.  Plaintiff maintains that the defendant fails to clarify how he implemented an unwritten policy and that since bread racks were always stacked, it was hardly effective.  Plaintiff's Opp. to DUF, pp. 35-36.

Defendant Haythorne declares that before the purchase of food tray covers, whenever he received a complaint about the stacking of racks, he immediately sent a supervising correctional cook to provide additional training to the pantry staff; that he never ignored any complaints about the stacking of food trays or racks and never instructed correctional or food services staff to ignore inmate complaints about the stacking of food trays or racks; that he was not involved in medically clearing inmates to handle food or to work in food service at CSPS or

in choosing volunteer workers to assist with cell feeding during modified programs or when needed, that when inmate grievances were filed alleging that non-medically cleared inmates were being used during the cell feeding process, he contacted the pantry officers and the facility captains to inquire if there was any truth to these allegations and that any such allegations were unsubstantiated.  Defendant Haythorne Dec. ¶ 14-17.  In addition, he avers that he never ignored or instructed correctional or food services staff to ignore the presence of rodents or any verminous condition in the main kitchen at CSPS, never ignored or instructed correctional or food services staff to ignore inmate complaints of the presence of rodents in the main kitchen; that if he was informed by correctional staff, cooks, or kitchen workers of a rodent sighting or evidence of their presence, he directed defendant Hague or the supervising correctional cook of that area to contact vector control, which would immediately respond to calls concerning the presence of rodents.  Defendant Haythorne Dec.  ¶¶ 18, 20.  Defendant Haythorne maintains he did not personally see a rodent or evidence of rodent activity during 2005 and 2006, although he concedes at least as to that period that rodents were entering the main kitchen as well as buildings throughout the prison due to heavy rains.  Defendant Haythorne Dec.  ¶¶ 19, 21.  Defendant Haythorne declares that rodents were virtually eliminated from the main kitchen; that the California Retail Food Code (CRFC) sets forth food industry sanitation standards and that rodent presence is not of itself a violation of health and safety standards; he further sums up that he never ignored inmate complaints or allegations that the food preparation or service at CSPS was unsanitary or violated health and safety standards, nor did he instruct correctional or food services staff to ignore such complaints.  Defendant Haythorne Dec. ¶¶ 21, 23, 24-25.

Plaintiff seeks to fault the defendant for relying on any unwritten policy without an established mode of circulation, for having notice of myriad deficiencies by way of inmate complaints and staff meetings, for waiting for inmate complaints to correct deficiencies, for not ascertaining which pantry staff were violating standards, and for not formulating any memo or bulletin addressing the issue of medical clearance of inmates to handle food when he was in

1    charge of correcting health and safety violations in the operation of food service, which

2    violations he maintains this defendant witnessed.  Plaintiff's Opp. to DUF, pp. 36-41.  Defendant

3    Haythorne himself admits that any policy addressed to the food tray covers were not addressed

4    until 2007, but this complaint is specifically addressed to events occurring in 2005 and 2006.

5    While plaintiff does not sufficiently raise a genuine issue of material fact as to whether this

6    defendant could be implicated for plaintiff's claimed food poisoning, the causation of which,

7    even assuming plaintiff suffered from it, the court has already noted plaintiff's near-impossibility

8    of proving.  In addition, despite his job description, this defendant arguably seeks to abdicate any

9    responsibility for any medical clearance policy or procedures of inmates handling food.  To the

10   extent plaintiff raises a sufficient dispute with respect to an Eighth Amendment violation in his

11   allegations against this defendant for a plethora of deficient standards in food sanitation and

12   preparation in the main and satellite food preparation and service procedures and

13   implementation, which while taken separately might not rise to such a level, summary judgment

14   for this defendant should be denied.

15              *Defendant Rodriguez*

16              It is not disputed that defendant Rodriguez began working as a supervising

17   correctional cook II at CSPS on January 26, 2006.  In that capacity, this defendant has the same

18   job responsibilities as those set forth by defendant Arndt.  See above & defendant Rodriguez'

19   Dec., ¶ 1.  Plaintiff contends that defendant Rodriguez knew about the alleged rodent infestation

20   in the main kitchen and the alleged violations occurring in the satellite kitchens, but he did not

21   make the proper changes or respond properly.  Plaintiff's Dep. at 127:9-13.  Although plaintiff

22   admits that defendant Rodriguez did not work in the satellite kitchens and that he never spoke to

23   Rodriguez about the stacking of racks, the alleged use of non-medically cleared inmates, or the

24   alleged failure of tier porters and tenders to wear gloves and hats during food service, plaintiff

25   contends that defendant Rodriguez knew of these alleged violations because Rodriguez

26   responded to inmate grievances.  Plaintiff's Dep. at 131:20-133:21.  Plaintiff also seeks to

1    implicate him, in his statement of facts in dispute (p. 53), for a failure to uphold state health and

2    safety standards.  Plaintiff also claims that defendant Rodriguez performed inspections of both

3    main and satellite kitchens, which is also how he knew of violations.  Plaintiff's statement of

4    disputed facts, p. 53 (and see below).

5            There is no dispute that a few months after arriving at CSPS, defendant Rodriguez

6    was assigned to investigate an inmate appeal alleging that the inmate contracted food poisoning,

7    that dirty trays were being used to serve food, that inmate workers were not wearing proper attire,

8    and that there was a rodent infestation in the main kitchen.  He does not recall the name of the

9    inmate who filed the appeal, but defendant Rodriguez investigated the complaints asserted in the

10   grievance.  According to defendant Rodriguez, he found that all but one of the complaints in the

11   inmate's grievance were unsubstantiated.  He visited the satellite kitchens and observed the cell

12   feeding process.  He saw that the trays and racks used during the feeding process were clean and

13   that the inmates were wearing the required gloves and hair nets.  He saw no violations in the

14   satellite kitchens.  Defendant Rodriguez Dec. ¶ 4.

15           Defendant Rodriguez states that he also reviewed the medical log for inmates who

16   visited the medical clinic, during the same period the inmate claimed to have contracted food

17   poisoning, to determine if there were other inmates complaining of stomach related problems.

18   Defendant Rodriguez spoke with Dr. Duc, and may have also talked to defendant Dr. Kelly,

19   about any reported food poisoning cases, and (even though he is unsure whether he spoke to

20   defendant Kelly), Rodriguez goes on to aver that both denied that there were any cases of food

21   poisoning or an outbreak of food poisoning at CSPS.  Defendant Rodriguez Dec. ¶ 5.  Defendant

22   Rodriguez states that his investigation revealed the presence of rodents in the main kitchen and

23   throughout the entire prison.   Defendant Rodriguez Dec. ¶ 7.  He asserts that he spoke to vector

24   control at CSPS and learned that rodents were coming into the prison buildings to seek shelter

25   from the heavy rains and that vector control was already taking corrective measures by laying out

26   traps in the main kitchen.  Id.

1        Plaintiff seeks to dispute that this defendant only learned about the rodent problem

2   during his investigation of the inmate grievance by reference to the Cronjager Dec.  (see Exh. F,

3   p. 1, to plaintiff's Dec., as noted above, wherein, on 3/31/06, CSPS staff cook Cronjager attests

4   to having observed, on 3/24/06, rodent contamination of 8 to 12 sheets of iced cake and to having

5   notified defendant Rodriguez of the incident on the day it occurred).  In addition to also

6   referencing defendant Rodriguez' discovery responses, which are not produced, plaintiff also

7   cites his declaration and the second amended complaint (SAC), to which he attached two

8   different inmate appeals, one of which was a group inmate appeal by an inmate Wright and

9   another by an inmate Williams, which both state that defendant Rodriguez investigated each of

10  those (corresponding to Exhs. K and L to his declaration in opposition, set forth above).  In the

11  verified SAC, as noted above, plaintiff recounts an interview between defendant Rodriguez and

12  Inmate Williams on April 14, 2006, on a complaint filed by Williams on March 2, 2006, in

13  which plaintiff contends that Rodriguez told Williams he had been working at CSPS for 15 years

14  and that during that period there had always been rats/rodents in the main kitchen, which were

15  controlled by "sticky traps," asking Williams to withdraw his appeal.  SAC, p. 11 & Exh. G.

16  Plaintiff also states that he and Inmate Williams showed defendant Rodriguez a dead rat in a

17  bucket to demonstrate rats were still roaming the kitchen, to which Rodriguez responded: "Get

18  that thing out of here, and go throw it away."  Plaintiff's Dec. in Opp. ¶ 14; plaintiff's Dep.

19  122:10-22 &  129:10-130:8.  While plaintiff's showing raises a question as to whether defendant

20  Rodriguez was previously aware of rodents in the main kitchen before the investigation wherein

21  he does acknowledge determining there were rodents throughout not only the main kitchen but

22  the entire prison, it does not show that this or any other defendant was aware of food poisoning

23  that was the result of unsanitary food preparation, particularly since he declares that he was

24  informed by a physician that there was no such reported case.  Plaintiff has not sufficiently

25  disputed defendant Rodriguez declaration that Rodriguez never saw anyone serve contaminated

26  food to inmates, nor disputed that in instances where food items are suspected to be contaminated

they are disposed of their entirety by CSPS policy.  Rodriguez Dec., p. 8.  Plaintiff's Exhs. K & L raise questions as to defendant Rodriguez' thoroughness and accuracy, insofar as both of these appeals, one an inmate group appeal, appear to have been assigned to him for investigation, indicating that there were at least two appeals, not one, that he investigated about food prep/service conditions.  Whether or not, in his capacity as correctional cook II, defendant Rodriguez could have done more to address inmate grievances with regard to the cell feeding process in the satellite kitchens is at least arguable, but plaintiff has not sufficiently supported an Eighth Amendment claim with regard to alleged state health and safety code violations.  Summary judgment should be granted as to this defendant.

### *Defendant Bernardino*

According to defendant Bernardino, he was employed by CDCR as a supervising correctional cook I in the distribution department of the CSPS main kitchen from 2001 to December 2006, but started in 1997 as a supervising correctional cook I in the CSPS main kitchen preparing food.  Defendant Bernardino Dec., ¶¶ 1-2.  Defendant Bernardino maintains that his duties as a distribution supervising correctional cook were to prepare all documentation to determine the portions of food needed and to ensure delivery of food to the satellite kitchens, but that he occasionally provided informal inmate appeal responses.  Defendant Bernardino Dec. ¶ 1.  Nevertheless, he avers that he does not recall responding to any inmate grievance about CSPS food service.  Defendant Bernardino Dec. ¶ 9.  Defendant Bernardino asserts that he never saw any rodent activity in the main kitchen at CSPS, does not recall discussing the presence of rodents in the main kitchen with any inmate, states that no CSPS official ever told him that there were rodents in the main kitchen, and is not aware of any food poisoning outbreak since his 1997 arrival at CSPS.  Defendant Bernardino Dec. ¶¶ 5-7.  Defendant Bernardino also states that he never contacted vector control at CSPS due to a vermin problem.  Defendant Bernardino Dec. ¶ 8.

\\\\\

1        Although plaintiff purports to dispute it, plaintiff conceded in his deposition that

2   his claim against Bernardino centered on his alleged awareness of rodents being in the main

3   kitchen, contending that defendant Bernardino knew about the presence of rodents because

4   plaintiff told him about the rodents and about the bread racks as well.  Plaintiff's Dep.:

5   151:20-152:4, 154:11-25.  Plaintiff does not dispute that he never showed defendant Bernardino

6   any evidence, such as a dead rodent, rodent feces, or food items with bite marks, of the presence

7   of rodents, nor does he dispute that he never asked defendant Bernardino what he was doing

8   about the rodent problem because Bernardino "was just the distribution supervisor."  Plaintiff's

9   Dep. at 157:14-23 & 159:7-11.  However, plaintiff's deposition testimony does somewhat

10  undermine defendant Bernardino's claim of a complete lack of awareness of the presence of

11  rodents in the main kitchen when plaintiff recalls having a conversation with him about the main

12  kitchen episode involving alleged rodent contamination of iced cakes described in the Cronjager

13  declaration, after which plaintiff states that defendant Bernardino said: "I will not be eating any

14  of that food back there again" and plaintiff further asserts that he does not recall ever seeing

15  Bernardino ever eating food from the main kitchen again.  Plaintiff's Dep. 157:22-159:2.

16       Defendants have conceded a problem with rodents, at least in 2005 and 2006, that

17  traps were laid throughout the main kitchen for the rats and defendant Rodriguez admits that

18  rodents were present throughout the entire prison, including the main kitchen.  Plaintiff, of

19  course, repeatedly asserts that the problem was longstanding, noting that, inter alia (see below),

20  defendant Smith, who worked at CSPS since September 2004, provided an interrogatory

21  response which plaintiff read at his deposition wherein she acknowledged that she "'saw or was

22  informed that there were rats and rodents in the back door and bakery areas of the main kitchen

23  early on in her employment with CSPS."  While there is no dispute that defendant Bernardino

24  was employed in the main kitchen distribution department, his claim to have no knowledge of

25  rodent activity in the main kitchen in light of defendants' own concessions, the number of inmate

26  grievances filed about CSPS main kitchen food preparation/service conditions (since he did

40

provide some informal appeal responses, according to his own declaration), and plaintiff's

insistence that the two conversed about the rodent problem certainly raises a question as to this

defendant's credibility with regard to his claim of total ignorance.  Further, since defendant

Bernardino maintains he never called vector control, whether or not in his capacity in the

distribution department he could or should have taken at least that step is an open question.

Plaintiff maintains that this defendant was one among many who failed to provide any

information regarding health and safety decontamination standards.  Plaintiff's Dec. in Opp., ¶

13.  Plaintiff asserts that defendant Bernardino has admitted in his discovery responses that his

duties extended to reporting and correcting activity that violates health and safety standards

(although again, plaintiff does not produce the responses); he maintains that memoranda about

the rodent problem put this defendant on notice and that he attended staff meetings where the

problem was discussed.  Plaintiff's Opp. to DUF, pp. 15-17.   However, in this defendant's

capacity as a distribution clerk, plaintiff himself concedes that he never asked him about the

rodent problem, which in itself, sufficiently undermines his claim against this defendant.  The

dispositive motion should be granted as to this defendant.

### *Defendant Hague*

Defendant Hague has been employed by CDCR at CSPS as assistant correctional

food manager since April of 2006, and explains that she assists in coordinating all related food

service activities, including preparing food and supply orders, taking inventories and inspecting

kitchens, as well as training correctional staff and sometimes reviewing and responding to inmate

appeals.  Defendant Hague Dec. ¶¶ 1-2.   She was a supervising cook II before that from January

2005.  Hague Dec.  ¶ 1; plaintiff's Dep. 109:14-23.  Plaintiff contends that defendant Hague was

aware of: the presence of rodents in the main kitchen; that inmates were stacking bread racks;

and that there were health and safety violations occurring and she did not take any steps to

correct them despite being put on notice numerous times.  Plaintiff's Dep. at 109:14-110:19.

Plaintiff admits that when he asked defendant Hague what was being done about the presence of

41

1  rodents, she told him that they were looking into it.  Plaintiff's Dep. at 121:16-25.

2  Defendants assert that plaintiff did not show any dead rodents to defendant Hague

3  in the main kitchen or point out to her rodent feces he claims were present in the storage room of

4  the bakery.  Nor did he show her the bags of food items he purportedly found with rodent

5  bitemarks.  Plaintiff's Dep. at 122:10-123:14.  However, plaintiff maintains that this defendant

6  was well aware of the rodent problem and had a meeting with other staff about it in January,

7  2006.  Plaintiff's Dep. 97:25-98:22.  When plaintiff worked in the satellite kitchens, defendants

8  state that he never informed defendant Hague that bread racks were being stacked and that

9  plaintiff admits that when defendant Hague was conducting an inspection of the satellite

10  kitchens, kitchen workers would stop stacking the racks in her presence and once she left, they

11  would go back to stacking the racks.  Plaintiff's Dep. at 123:20-124:3.  However, as noted,

12  plaintiff has submitted minutes of a July 13, 2006, meeting which included C-facility men's

13  advisory council members and prison officials, including defendant Hague, wherein this

14  defendant purportedly admitted that she had witnessed tray stacking in the satellite kitchens and

15  that she was told by a staff person that as soon as she left the trays would be stacked again.  Exh.

16  R to SAC and Exh. EE to plaintiff's Dec.in Opp.

17  It is undisputed that plaintiff further admits that he has no evidence that defendant

18  Hague was aware of the alleged use of non-medically cleared inmates to serve food, and he never

19  discussed this issue with her.  In 2005 or 2006, defendant Hague learned that a couple of inmates

20  at CSPS filed grievances complaining about the food service at CSPS, the presence of rodents in

21  the main kitchen, and claiming that they got food poisoning from the prison food.  She reviewed

22  or responded to one of these grievances, but does not recall who filed the grievance or when she

23  reviewed or responded to it.  Defendant Hague Dec. ¶ 4.  After a complete investigation,

24  defendant Hague determined that the inmate appeal complaining about the food service at CSPS

25  was unsubstantiated.  In connection with her investigation, defendant Hague contacted the

26  medical department to inquire whether there had been any confirmed cases of food poisoning.

1   Defendant Hague Dec. ¶¶ 5-6.  Defendant Hague declares that no correctional, food services, or

2   medical staff ever told defendant Hague that an inmate got food poisoning, or that there was a

3   food poisoning outbreak, at CSPS in 2006, and that had a case of food poisoning been confirmed,

4   CSPS has health and safety protocols in place to address food-borne matters, which includes

5   notifying the Health Care Manager and Correctional Food Manager (CFM), setting aside a

6   sample tray of food from each pantry kitchen, and preserving the trays until medical staff

7   determined that testing was needed.  Hague never had to implement these procedures while

8   ACFM at CSPS.  Defendant Hague Dec. ¶ 7; defendant Haythorne Dec. ¶ 4; plaintiff's Dep. at

9   169:4-7 & 22-25.  Plaintiff maintains that he has submitted evidence that he and other inmates

10  were treated for food poisoning by the medical department.  Plaintiff's Opp. to DUF, p. 21 (see

11  above).  As the court has noted, however, even if plaintiff could clearly show he had food

12  poisoning that it was the result of any of the conditions of which he complains in this complaint.

13          Defendant Hague states that she never ignored or instructed correctional, food,

14  services, or medical staff to ignore inmate complaints about food poisoning at CSPS.  Defendant

15  Hague Dec. ¶ 8.  As have other defendants, she states that rodents were coming into the main

16  kitchen and other buildings throughout the prison because of the heavy rain fall from the winter

17  of 2005-2006, that vector control took corrective measures by laying down traps, that she kept in

18  regular contact with vector control during this period to monitor the progress of eliminating the

19  presence of rodents in the main kitchen; that meetings were also held between defendant

20  Haythorne, vector control, and defendant Hague to monitor the situation, that she was informed

21  by correctional staff, cooks, or kitchen workers of a rodent sighting or evidence of their presence,

22  either she or the supervising correctional cook of that area would immediately contact vector

23  control.  Defendant Hague Dec. ¶¶ 9-10; Defendant Haythorne Dec. ¶ 19.  While again not

24  disputing that traps were put out, plaintiff continually states that no steps were taken to actually

25  exterminate the rodents, to decontaminate the main kitchen or to cover exposed food left out

26  overnight, to instruct on how to sanitize what he maintains were contaminated areas or to dispose

1   of prepared or stored food that may have been contaminated.  Plaintiff's Opp., to DUF, pp. 23-

2   24, Plaintiff's Dec., Cronjager Dec.

3          Although defendant Hague indicates she conducted kitchen inspections, including

4   satellite kitchen inspections, she states she did not see a rodent or evidence of rodent activity in

5   2005 or 2006, but that any contaminated food was immediately discarded and that no

6   contaminated food has ever been fed to inmates.  Defendant Hague Dec. ¶¶ 11-12, 15.  Of

7   course, this defendant and others have conceded rodent activity in 2005 & 2006, and have

8   claimed to have repeatedly called vector control to lay traps.

9          Defendant Hague avers that she never instructed correctional or food services staff

10  to ignore the presence of rodents or any verminous condition in the main kitchen at CSPS and,

11  like defendant Haythorne, asserts that the presence of rodents and other vermin is common in any

12  location where food is located or prepared.  The California Retail Food Code (CRFC), which sets

13  the health and safety standards for cooking facilities such as CSPS, according to defendants,

14  focuses on controlling the presence of rodents and vermin and ensuring that contaminated food is

15  not served.  The presence of rodents in a kitchen or area where food is prepared and stored,

16  defendants aver, is not in and of itself a violation of health and safety standards.  Defendant

17  Hague Dec. ¶¶ 13-14; Defendant Haythorne Dec. ¶ 23.

18         Defendant Hague also asserts that during her satellite kitchen inspections in 2005

19  and 2006, inmates working in the kitchens wore proper protective attire, such as gloves and hair

20  nets and that she did not see workers stack food trays or bread racks, the use of dirty carts or

21  bread racks, or bread racks thrown on the floor.  Defendant Hague Dec. ¶ 15.  Plaintiff has

22  repeatedly asserted that defendant Hague herself admitted to defendant Lieber and others in a

23  July 2006 meeting (noted above) that she was well aware of tray-stacking in the kitchens;

24  plaintiff also asserts that defendant Lieber made this admission in a discovery response (which

25  cannot be located by the court, but which is not disputed by defendant).  Plaintiff Opp. to DUF,

26  p. 26.

1    Hague declares that until food tray covers were purchased in approximately 2007,

2    food trays were not allowed to be stacked and that while there was no written policy prohibiting

3    the stacking of bread racks, which were used to carry the food trays, defendant Hague advised

4    dining hall officers of the satellite kitchens not to stack the racks either.  After the purchase of

5    food tray covers and with use of deeper bread racks, defendant Hague circulated a memo stating

6    that racks could be stacked but not more than three high.  Defendant Hague Dec. ¶ 16.  During

7    2005 and 2006, when informed by either staff or inmates that bread racks were being stacked,

8    defendant Hague avers that she contacted the dining room officer to immediately address and

9    correct the matter, and states she provided instruction and training on proper food service and

10   handling to the officers assigned to the satellite kitchens.  And if needed, she would inform

11   defendant Haythorne, who would report the non-compliance to the Correctional Business

12   Manager I or the Associate Warden Business Services Facility Captains, or have her contact

13   these individuals.  Defendant Hague Dec. ¶ 17.

14   Plaintiff counters that the effect of stacking bread racks was the same as stacking

15   food trays in that contaminates could fall into the uncovered food tray from the bottom of a

16   stacked rack and that this defendant knew of the stacking of racks over uncovered food trays

17   since 2002, not addressing the problem until 2007.  Plaintiff's Opp. to DUF, p. 27.  Plaintiff also

18   faults this defendant for not having a written policy with regard to the stacking of racks, a health

19   issue.  Id.

20   Defendant Hague declares that she never ignored inmate complaints about the

21   stacking of food trays or racks; never instructed correctional or food services staff to ignore

22   inmate complaints about the stacking of food trays or racks; was never involved in medically

23   clearing inmates to handle food or to work in food service at CSPS or in choosing volunteer

24   workers to assist with cell feeding during modified programs or when needed; never ignored

25   inmate complaints or allegations that the food preparation or service at CSPS was unsanitary or

26   violated health and safety standards and did not instruct correctional or food service staff to

45

1    ignore such complaints.  Defendant Hague Dec. ¶¶ 18-21.

2            Plaintiff states that it was a form of deliberate indifference to the stacking of trays

3    and racks when inmate complaints about the practice were made as early as 2002 and 2003; he

4    claims that food tray covers should have been provided in response to inmate complaints in

5    2005-2006, instead of waiting until after inmates were getting sick from the food service and

6    until after this litigation was initiated to buy tray covers.  Plaintiff's exhibits, including himself,

7    show inmates claim to have contracted food poisoning as a result of food prep and service in the

8    CSPS main and satellite kitchens, but again plaintiff has a difficult causation hurdle that he does

9    not adequately address.  Plaintiff's evidence raises questions (July 2006 meeting above) as to

10   whether defendant Hague was fully aware that bread racks were being stacked over open food

11   trays despite any instructions she may have given, and whether she should have taken further

12   steps to comply with health and safety regulations and should have implemented a written policy.

13   Also, the issue of medical clearance of inmates is not adequately addressed by this defendant.

14   Although the causation issue appears with regard to whether or not uncovered food trays caused

15   food poisoning to be a very difficult one, a question that remains is to what extent uncovered

16   food trays in the cell areas were exposed to contamination and how frequently.  Summary

17   judgment should be denied this defendant.

18            *Defendant Ruller*

19            Defendant Ruller states that he has been a supervising correctional cook II at

20   CSPS since July of 2004, with the same responsibilities set forth for that position by defendants

21   Arndt and Rodriguez, above.  Ruller Dec., ¶ 1.  Plaintiff's claim against defendant Ruller centers

22   upon the presence of rodents in the main kitchen and that defendant Ruller should have seen all

23   the health and safety violations because of his training in sanitation and performing kitchen

24   inspections and corrected them.  Plaintiff's Dep. at 137:15-140:5; Plaintiff's Opp. to DUF, pp.

25   56-57.  Plaintiff admits that he was not with defendant Ruller during the latter's inspections of

26   the main kitchen, and defendant Ruller never told plaintiff what he (Ruller) saw during his

inspections.  Plaintiff's Dep. at 140:6-21 & 141:20-22.  Defendant Ruller declares that he learned that a couple of inmates at CSPS filed grievances complaining about the food service, the presence of rodents in the main kitchen, and contracting food poisoning at CSPS.  In responding to or investigating one of these grievances, defendant Ruller states that he contacted the medical department to inquire if the inmate had in fact gotten food poisoning and spoke to other staff about the allegations made in the grievance, determining that the complaints of grievance were not substantiated.  Defendant Ruller Dec. ¶ 3.  This defendant states that he saw no evidence of rodents during his main kitchen inspections; that when such evidence was reported to him, he immediately contacted vector control, who would lay down sticky traps in the area; that his occasional inspections of the satellite kitchens revealed no stacking of bread racks, use of dirty carts or racks, or kitchen workers without appropriate attire.  Defendant Ruller Dec. ¶¶ 4-5, 8. He maintains that no staff ever told him that nonmedically cleared inmates were handling food in the satellite kitchens.  Defendant Ruller Dec. ¶ 9.

　　　　In seeking to dispute defendant Ruller's representations, plaintiff argues, essentially, that this defendant's inspections were inadequate if he found no violations; he maintains that dirty carts, tier tenders/porters (who do not wear proper attire for food handling), bread racks on the floor are all located in the buildings, not in the housing units this defendant inspected.  Plaintiff's Opp. to DUF, p. 59, citing admissions by this defendant and others, although these discovery responses do not appear to be included in the opposition exhibits.  In any case, while the somewhat rote-sounding averments by defendants responsible for kitchen inspections that they never witnessed evidence of rodents when they admit that rodents were a problem raises some question, plaintiff cannot show that this defendant did not immediately contact vector control to lay traps for rodents when they were reported to him, nor can he show that this defendant actually witnessed the lack of sanitation in food preparation or service that plaintiff decries, despite inmate complaints about such conditions to the contrary.  Summary judgment should be entered for this defendant.

1          *Defendant Smith*

2          It is undisputed that defendant Smith was a supervising correctional cook I at

3   CSPS from September 20, 2004, to October 17, 2006, and that she was the back-up relief for

4   every position in the main kitchen.  Plaintiff's claim against defendant Smith is limited to the

5   alleged presence of rodents in the main kitchen, but he admits never having asked her what was

6   being done about the rodents.  Plaintiff's Dep. at 162:24-163:2 & 164:6-8.  Defendant Smith

7   admits to having seen a rodent or evidence of rodent activity at CSPS around five times in the

8   main kitchen bakery area, although she avers that she never saw an rodent infestation in the main

9   kitchen.  Defendant Smith Dec. ¶¶ 2, 4.  Smith declares that whenever she saw a rodent or

10  evidence of rodent activity in the bakery area or whenever someone informed her that they had

11  seen a rodent or evidence of the presence of rodents, she immediately contacted vector control,

12  who would lay down sticky traps in the area.  Defendant Smith Dec. ¶¶ 2.  Defendant Smith

13  asserts that rodents were more prevalent in the main kitchen back dock area, which is an open

14  area where deliveries are made and faces a field, but that she never saw rodents in the back dock

15  food storage rooms.  Defendant Smith Dec. ¶ 3.

16         In dispute, plaintiff avers that he did not see this defendant rush to call vector

17  control every time he and Smith witnessed rodents, which were regularly present in the bakery

18  storage room from January to August 2006, and he maintains that although she admitted to

19  seeing rodents early on in her employment at CSPS, that baked goods were still left out daily.

20  Plaintiff's Dep: 163:5-11; Plaintiff's Opp. to DUF, p. 61.  On the other hand, plaintiff also

21  conceded that this defendant never told him that she had ever seen evidence of food

22  contaminated by rodents being fed to inmates.  Plaintiff's Dep.: 163:21-164:5.  This defendant

23  also averred that she never responded to any inmate grievance complaining about food service at

24  CSPS.  Defendant Smith Dec ¶ 8.  Plaintiff in seeking to implicate so many prison employees,

25  has overreached with regard to this defendant, insofar as he is unable to show that in her

26  capacity, even assuming that she did nothing more than contact vector control (whether he

48

1   witnessed it or not), she could or should have implemented further corrective policies.  Summary

2   judgment should be entered for this defendant.

3                    *Defendant Leiber*

4            Defendant Leiber has been CSPS facility captain on C-yard since November 28,

5   2005, and as such is responsible for the supervision and operation of the facility, responsible for

6   review of disciplinary action taken against inmates and for ensuring that staff follow procedures

7   and are properly trained, and she also reviews inmate appeals.  Defendant Leiber Dec.  ¶¶ 1-2.

8   Plaintiff asserts that defendant Leiber is liable as the supervisor of C-yard at CSPS, which

9   includes the main kitchen, for failing to correct problems of which she was made aware, violating

10  health and safety standards.  Plaintiff's Dep. at 55:24-56:8.  Plaintiff acknowledges that he never

11  worked directly or talked with defendant Leiber, but claims that she knew of the alleged

12  violations because she reviewed inmate grievances complaining about the food service at CSPS,

13  including his, and because she inspected the main and satellite kitchens and had to see what was

14  going on.  Plaintiff's Dep. at 56:5-18, 57:15-58:11.

15           Defendant Leiber states that she reviewed an inmate appeal complaining about the

16  food service at CSPS, but that an investigation of the grievance disclosed no support for the

17  asserted complaints, nor did she receive any information from the medical department to support

18  the allegation that the inmate had food poisoning.  Defendant Leiber Dec. ¶¶ 3-5.  Defendant

19  avers that she has inspected the main and satellite kitchens in C-yard and that in her inspections

20  of the satellite kitchens in 2005 and 2006, she never saw bread racks being stacked, kitchen

21  workers without gloves, hair nets, or other required attire, kitchen workers using dirty carts or

22  bread racks during the feeding process, or racks thrown on the floor.  Defendant Leiber Dec. ¶¶

23  6-7.  She maintains that, when needed, volunteer inmates, but only those who have been

24  medically cleared, are used to help with the cell feeding process and it is the dining hall officer's

25  responsibility to check to see that a volunteer has been medically cleared; moreover, she states

26  that no correctional, food services, or medical staff ever told Leiber that nonmedically cleared

inmates have been used during the cell feeding process or that they have handled food.
Defendant Leiber Dec. ¶¶ 8- 9.  Defendant Leiber also asserts that although located in C-yard, the
main kitchen is not her responsibility with regard to the proper preparation and safe handling of
food, but rather that of the correctional food manager, and that Leiber's inspections of the main
kitchen are related to security matters, such as a missing tool.  Defendant Leiber Dec. ¶ 11.
Finally, defendant maintains that in 2005 and 2006, no correctional, food services, or medical
staff ever told her there were rodents, or a rodent infestation, in the main kitchen.   Defendant
Leiber Dec. ¶ 13.

         Plaintiff has produced evidence to support his claim that this defendant was, at a
minimum, aware of numerous inmate complaints regarding food preparation and food service in
the main and C-facility satellite kitchens; indeed, defendant herself acknowledges that she
approved and signed off on inmate appeal responses.  Defendant Leiber Dec. ¶ 4.  Plaintiff has
also demonstrated that this defendant was in attendance at a meeting with the men's advisory
council, wherein inmate concerns about food preparation/service were evidently discussed.  Exh.
R to SAC.  In addition, this defendant references the 2007 purchase of food trays (for use as tray
covers), indicating prior to that purchase, food trays and bread racks "were not supposed to be
stacked," but that the stacking of racks was not part of a written policy; since that time, however,
while there is still no written policy about not stacking bread racks, there is a written policy that
they should not be stacked more than three high.   Defendant Leiber Dec. ¶ 6.  There is sufficient
information provided by plaintiff to show that this defendant was on notice that, at a minimum,
inmates complained repeatedly of health and safety violations in the main and satellite kitchens,
but not, for example, as plaintiff maintains, that this defendant actually authorized the use of
inmates not medically cleared to handle the food.  Opp. to DUF, p. 48.  The problem for plaintiff
here is that plaintiff is unable to show that the inmate claims of lack of sanitation in food
preparation and service, even though persistent, actually rose to the level of an Eighth
Amendment violation such that this defendant was one sufficiently aware and culpable for nor

1    rectifying such alleged violations.  Summary judgment should be entered for this defendant.

2    _Defendant Baughman_

3    Defendant Baughman states that he has been a CSPS B-yard facility captain since

4    October, 2005.  Defendant Baughman Dec., ¶ 1.  Defendant Baughman, as a facility captain, has

5    the same job responsibilities as those set forth by defendant Leiber.  Baughman Dec. ¶ 1; Leiber

6    Dec. ¶ 2.  Plaintiff's claims against defendant Baughman center on his allegations that the B-yard

7    satellite kitchens were stacking racks, using dirty carts, and using volunteer, non-medically

8    cleared inmates in food service; plaintiff seeks to make his claim more expansive to the extent

9    that he contends that defendant Baughman did not hold staff accountable for health and safety

10   violations and he did not make sure tier tender/porter job descriptions required that they be

11   medically cleared in order to handle food, but rather permitted them to handle food service every

12   day.  Plaintiff's Dep. at 147:11-148:1, plaintiff's DUF to Opp., pp. 9-10.  It is undisputed that

13   plaintiff never personally discussed these issues with defendant Baughman.

14   Plaintiff references an appeal regarding health and safety violations in B-facility

15   housing units.  Plaintiff's Dec., ¶¶ 28-29.  Baughman concedes that he reviewed an inmate appeal

16   complaining about the food service at CSPS, but that after an investigation, the complaints raised

17   in the appeal were not substantiated.  Baughman Dec. ¶¶ 2-3.

18   Plaintiff cites, inter alia, cites CAL. CODE REGS. tit.xv, § 3052 (g) which states that

19   "[n]o inmate shall be assigned to the food service area until medically cleared to handle food."

20   Although defendants maintain plaintiff has admitted not knowing whether volunteers are

21   screened beforehand or whether officers confirm clearance before allowing an inmate to

22   volunteer during food service, citing plaintiff's  Dep. at 150:18-20, 151:5-19, 153:1-154:10 &

23   157:6-13, plaintiff cites the same deposition for support for his allegation that the volunteers used

24   to handle food must be provided chronos showing clearance and that he knows of inmates

25   permitted to do so without being medically cleared.  Plaintiff's Dep. at 153:1-13.  Defendant

26   Baughman maintains that as facility captain, he has toured and inspected the satellite kitchens in

51

B-Yard and that, before the purchase of food tray covers in approximately 2007, he never saw kitchen workers stack the bread racks, never saw kitchen workers without, gloves, hair nets, or other required attire, did not see kitchen workers use dirty carts or bread racks, and he did not see racks on the floor.  Defendant Baughman Dec. ¶ 4.  Like defendant Leiber, this defendant states that volunteer workers are used when necessary to help with the cell feeding process and that they are chosen from a pool of inmates that have been medically cleared.   He also asserts that it is the responsibility of the dining hall officer to check if the volunteer is medically cleared to handle food.  Defendant Baughman Dec. ¶ 6; Defendant Leiber Dec. ¶ 8.  Defendant Baughman insists he has never seen an inmate whom he knew not to be medically cleared handle food at CSPS, and maintains that no correctional, food services, or medical staff ever told him that non-medically cleared inmates have been used during the cell feeding process or that they have handled food.  Defendant Baughman Dec. ¶¶ 7-8.

Plaintiff does not produce sufficient evidence to definitively show that inmates working in the B-yard satellite kitchens have not been medically cleared prior to handling food, although he does provide enough to at least raise a question on the point.  It is also troubling that almost every defendant appears to seek to absolve him or her self of any responsibility to make sure only medically cleared inmates handle food.  Likewise appeal responses, by reiterating that bread racks are not to be stacked, at least imply some awareness of on-going stacking.  See, e.g., plaintiff's Dec., Exh. O.  This defendant also references a change in 2007 to covering food trays, from which it can be inferred that contamination, or at least inmate complaints of contamination, and unsanitary food service conditions were not rectified by earlier responses and practices.  However, once again, plaintiff does not sufficiently raise an issue that this defendant's conduct rose to the level of an Eighth Amendment violation.  The dispositive motion should be granted as to this defendant.

\\\\\

\\\\\

1          *Defendant Kelly*

2          It is undisputed that defendant Dr. Kelly was acting health care manager (AHCM)

3    at CSPS from February 2006 to February 2007, and that plaintiff never spoke with defendant

4    Kelly about not receiving his medication; nor did he ever write to her informing her of such and

5    plaintiff has no knowledge whether defendant Kelly was aware that plaintiff was not receiving

6    his medication.  While defendant Kelly asserts that plaintiff claims that she, as the health care

7    manager, was responsible for ensuring that he received proper medical care, and she failed in her

8    duties because plaintiff was not receiving the medication he needed for his alleged food

9    poisoning, citing plaintiff's Dep. at 59:4-60:22, plaintiff also insists that this defendant was

10   responsible for properly managing health care issues.  Plaintiff's Dep. at 59:9-14.

11          Plaintiff puts forth no evidence to show that defendant Kelly ever treated him, and

12   she declares that she had no knowledge of plaintiff's medical conditions or prescriptions he was

13   taking or were prescribed to him at CSPS.  Defendant Kelly Dec. ¶ 2.  Defendant Kelly declares

14   that she has never conducted a medical examination of an inmate to clear him for food service,

15   nor has she been involved in medically clearing inmates for work in the kitchens or food service

16   at CSPS, but she does maintain that her function as ACHM was to oversee the CSPS medical

17   department at CSPS, to supervise lower ranking physicians and to formulate departmental

18   policies, as well as to review and respond to inmate appeals.  Kelly Dec. ¶¶1, 9.  Defendant Kelly

19   avers that she learned that an inmate filed a grievance complaining about the presence of vermin

20   in the main kitchen and getting sick from the prison food, but she does not recall when the

21   grievance was filed or who filed it, and that an investigation of the inmate's complaints about

22   vermin in the main kitchen at CSPS and getting sick from the food were unsubstantiated.

23   Defendant Kelly Dec.¶¶ 3-5.

24          While she insists that no correctional, food services, or medical staff ever told her

25   that: (1) there was a vermin infestation in the main kitchen; (2) dirty bread racks or carts were

26   being used during the cell feeding process; (3) non-medically cleared inmates were handling

53

food; and (4) food trays or bread racks were being improperly stacked, in addition to the inmate

appeal referenced, she also recalls a staff member making an "offhand remark" that there were

rodents in the main kitchen; she also maintains that she never instructed any medical,

correctional, or food services staff to ignore inmate complaints about: (1) unsanitary food service

at CSPS; (2) food poisoning; (3) the presence of rodents or any verminous condition in the main

kitchen; (4) using nonmedically cleared inmates during the food service; (5) the stacking of food

trays or bread racks or the use of dirty carts or racks; and (6) food service workers' failure or

refusal to wear the proper protective attire, such as gloves and hair nets.  Defendant Kelly Dec. ¶¶

7-16.  Defendants correctly state that supervisors in their supervisory role can be held liable in a

§ 1983 action in an individual capacity for participation in the deprivation of a constitutional

right if there exists a sufficient causal link between the wrongful conduct and the constitutional

violation.  MSJ, p. 12, citing Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991).

"Supervisory liability is imposed against a supervisory official in his individual capacity for his

'own culpable action or inaction in the training, supervision, or control of his subordinates.'"  Id.

Plaintiff simply does not show that this defendant was aware of a constitutional

violation, and failed to take action knowing that dire consequences would ensue from the lack of

action.  Summary judgment should be granted as to this defendant.

### Defendant Malfi

It is undisputed that from May to December 2006, defendant Malfi was the acting

warden at CSPS and that plaintiff's claim against defendant Malfi is for supervisory liability and

not that defendant Malfi prepared or mishandled food at CSPS.  It is also undisputed that

defendant Malfi had a practice of walking the prison grounds on occasion and conducting a

visual inspection of the area, including the main and satellite kitchens.

Defendant Malfi declares that during the time he was acting warden at CSPS, he

does not recall having reviewed any inmate appeal complaining about the food service at CSPS,

but that had he received or reviewed such a grievance, it was his custom and practice to assign a

1    supervisor to investigate the appeal and he would have done so; defendant Malfi further states

2    that he would have contacted the food manager to determine whether there was a problem and

3    would, if needed, have contacted the chief of plant to ascertain if vector control had responded to

4    the problem, if needed.  Defendant Malfi Dec. ¶ 2.

5            As to this point, plaintiff counters that defendant Malfi signed off an appeal

6    response, dated June 12, 2006, citing a group inmate appeal concerning alleged food service

7    health and safety violations.  Plaintiff's Opp. to DUF, pp. 49-50; Exh. P to SAC.  In addition,

8    Exh. M to plaintiff's Dec. in Opp., is a copy of an appeal filed by plaintiff, apparently submitted

9    on May 23, 2006, blaming continuing deficiencies in the main and satellite kitchens for

10   plaintiff's having allegedly been treated for food poisoning on three occasions, the second level

11   denial of which defendant Malfi appears to have signed.  Further, defendant Malfi appears to

12   have signed the second level appeal response, deemed a partial grant, on November 30, 2006, to

13   plaintiff's appeal, filed on September 21, 2006, complaining of alleged staff failures in B-yard,

14   since his August 18, 2006 arrival on the yard, to wear kitchen hats, to not change gloves after

15   touching contaminated surfaces before serving food, to stack bread racks containing [uncovered]

16   food trays, to use filthy cards for food service.  Exh. U to SAC, Exh. O to plaintiff's Dec. in Opp.

17   Plaintiff also asserts that he sent letters to defendant Malfi attached to his appeal of Sept. 21,

18   2006, via inmate legal mail.  Plaintiff's Dep. 148: 2-6, Exh. U to SAC.  None of this, of course,

19   disputes that this defendant does not recall having received any such grievance, but it does

20   suggest that defendant Malfi's memory may be somewhat unreliable on this point, possibly due

21   to the passage of time.  Even so, whether or not this defendant did receive or review some inmate

22   grievances concerning alleged food service and preparation deficiencies, on the face of it, does

23   not signify that these grievances had sufficient foundation.

24           Defendant Malfi goes on to state that during the times that he walked through the

25   main kitchen at CSPS, he saw no rodents or evidence of their presence, nor did he see violations

26   on his walks through the satellite kitchens, such as the use of dirty equipment or inadequately

1    dressed workers.  Defendant Malfi Dec. ¶¶ 4-5.  Further, he maintains that no correctional, food

2    services, or medical staff told him that: (1) there were rodents or a vermin infestation in the main

3    kitchen; (2) dirty bread racks or carts were being used during the cell feeding process; (3)

4    non-medically cleared inmates were handling food; and (4) there was a food poisoning outbreak

5    at CSPS.  Defendant Malfi Dec. ¶¶ 6-9.  Nor, according to defendant Malfi did he ever instruct

6    any medical, correctional, or food services staff to ignore inmate complaints about: (1) unsanitary

7    food service at SAC; (2) food poisoning; (3) the presence of rodents or any verminous condition

8    in the Main Kitchen; (4) the use of nonmedically cleared inmates during food service; (5) the

9    stacking of food trays or bread racks or the use of dirty carts or racks; and (6) food service

10   workers' failure or refusal to wear the proper protective attire, such as gloves and hair nets,

11   during the cell feeding process at CSPS.  Defendant Malfi Dec. ¶¶ 10-15.

12          Plaintiff cannot materially dispute these representations, but seeks to fault

13   defendant Malfi for, in plaintiff's guess, not having walked into parts of the main kitchen where

14   rodents would have been, and claims that whether or not Malfi saw violations in the satellite

15   kitchens does not mean they were not occurring, and that his failure to identify and correct them

16   constitutes deliberate indifference.  Plaintiff's Opp. to DUF, pp. 50-51, Cronjager Dec.,

17   plaintiff's Dec.  Although defendant Malfi asserts that no staff informed him of health and safety

18   standard violations, plaintiff argues that inmate complaints enumerated them and that state law

19   mandated corrective action.  Plaintiff's Opp. to DUF, p. 51, citing Cal. Health and Safety Code

20   sections.  Even assuming state law did require correcting policies or procedures in place, plaintiff

21   does not raise a genuine issue of material fact on this showing that this defendant is implicated in

22   conduct that resulted in a violation of the Eighth Amendment.  The motion for summary

23   judgment as to this defendant should be granted.

24          *Defendant Walker*

25           There is no dispute the defendant Walker was the acting warden at CSPS from

26   December 2006 to October 2007, and prior to December 2006, that he was chief deputy warden

1    and would, as needed, function as acting warden.  Defendant Walker states that, as warden and

2    acting warden, he was responsible for the overall operation and supervision of CSPS.  Defendant

3    Walker Dec. ¶ 1.

4            Plaintiff's claim against defendant Walker is for supervisory liability; he is not

5    claiming that defendant Walker directly mishandled or improperly cooked food at CSPS.

6    Plaintiff's Dep. at 54:8-16, 19-25.  Plaintiff claims that defendant Walker knew of the alleged

7    violations in the food service at CSPS because Walker reviewed inmate grievances and did not

8    take action to correct the alleged violations, and plaintiff claims to have written to him a number

9    of times, but he never spoke to defendant Walker personally about the complaints in his inmate

10   appeals.  Plaintiff's Dep. Vol. 1 at 55:1-13.

11           According to defendant Walker, in his capacity he only reviewed inmate appeals

12   alleging staff complaints.  Defendant Walker reviewed a couple of inmate appeals complaining

13   about staff providing unsanitary food service and maintaining unsanitary conditions in the main

14   kitchen, but does not recall if plaintiff was one of the complaining inmates.[17]   Defendant Walker

15   Dec. ¶ 2.

16           Defendant Walker avers that he ordered an investigation into the complaints made

17   in the inmate appeals concerning the unsanitary food service and conditions at CSPS, but that

18   investigations revealed no support for the allegations of the grievances.  Defendant Walker Dec.

19   ¶¶ 3-4.  Defendant Walker maintains that he has a practice of walking the prison grounds on a

20

---

21           [17] Plaintiff omits any reference to this alleged undisputed fact, and the court would deem
22   this to be an undisputed fact as the burden is upon plaintiff to dispute it once an adequately
     supported material fact has been set forth as undisputed; however, defendant's own declaration
23   undermines the point, probably inadvertently, by stating "I recall reviewing an inmate appeal
     from Plaintiff complaining about the cell feeding process or the presence of rodents in the Main
24   Kitchen."  Defendant J. Walker Declaration, ¶ 2.  Although this sentence is preceded by a
     statement that, as warden and chief deputy warden, he only received inmate appeals alleging staff
25   complaints and is followed by one indicating that he had reviewed inmate appeals complaining
     about staff allowing unsanitary food service and conditions, the point as to whether or not he
26   reviewed any appeal by plaintiff is made so confusing as to render the contention that he did not
     inadequately supported.

1   regular basis, and making visual observations of all areas, including the main and satellite

2   kitchens, but that complete and proper inspections of the main and satellite kitchens are the

3   responsibility of the food services staff.  Defendant Walker Dec. ¶ 5.  Defendant Walker reports

4   that in his walks through the CSPS main kitchen, he saw no evidence of rodents being present,

5   nor did his occasional walks through the satellite kitchens reveal any violations to him, such as

6   the use of dirty equipment or improperly dressed workers.  Defendant Walker Dec. ¶¶ 6-7.  DUF

7   119.  This defendant avers, as have other defendants herein, that no correctional, food services,

8   or medical staff ever told him that: (1) there was a food poisoning outbreak at CSPS (2)  there

9   were rodents or a vermin infestation in the main kitchen; (3) dirty bread racks or carts were being

10  used during the cell feeding process; (4) non-medically cleared inmates were handling food; and

11  (5) food trays and bread racks were being improperly stacked.  Defendant Walker Dec. ¶¶ 8-12.

12          Defendant Walker asserts, also as have other defendants, that he never instructed

13  any medical, correctional, or food services staff to ignore inmate complaints about: (1) unsanitary

14  food service at CSPS; (2) food poisoning; (3) the presence of rodents or any verminous condition

15  in the main kitchen; (4) the use of non-medically cleared inmates during food service; (5) the

16  stacking of food trays or bread racks or the use of dirty carts or racks; and (6) food service

17  workers' failure or refusal to wear the proper protective attire, such as gloves and hair nets,

18  during the cell feeding process at CSPS.  Defendant Walker Dec. ¶¶ 13-18.

19          Plaintiff seeks to implicate this defendant for his alleged deliberate indifference to

20  all of the conditions which have been exhaustively set forth herein.  Plaintiff's Opp. to DUF, pp.

21  62-67; plaintiff's Dec.  While summary judgment should be entered for this defendant in

22  his individual capacity because the court has not found that each of the conditions complained of

23  can be found to rise to the level of an Eighth Amendment violation, plaintiff also seeks

24  prospective injunctive relief.   Plaintiff's exhibits show that some of the unsanitary food

25  preparation/service conditions implicated appear to continue to plague CSPS' food preparation

26  and service and the combination of alleged unsanitary conditions might implicate plaintiff's

1    constitutional rights.  Therefore, this action should proceed against Acting Warden Walker, but

2    in his official capacity only.

3    _____*Qualified Immunity*

4           Defendants argue that they are entitled to qualified immunity.  In resolving a

5    claim for qualified immunity the court addresses two questions: (1) whether the facts, when taken

6    in the light most favorable to plaintiff, demonstrate that the officer's actions violated a

7    constitutional right and (2) whether a reasonable officer could have believed that his conduct was

8    lawful, in light of clearly established law and the information the officer possessed.  Anderson v.

9    Creighton, 483 U.S. 635, 107 S.Ct. 3034 (1987).   Although the Supreme Court at one time

10   mandated that lower courts consider these two questions in the order just presented, more

11   recently the Supreme Court announced that it is within the lower courts' discretion to address

12   these questions in the order that makes the most sense given the circumstances of the case.

13   Pearson v. Callahan, --- U.S. ----, 129 S.Ct. 808, --- L.Ed.2d ----, 2009 WL 128768 (January 21,

14   2009).

15          The *sine qua non* for qualified immunity requires a finding that the defendant

16   could not have reasonably known that the law violated was clearly established.  Pearson v.

17   Callahan, __U.S.__, 129 S.Ct. 808 (2009).  A defendant need not be presented with a precisely

18   identical situation encompassed within a prior case finding a violation of law before it can be

19   said that a reasonable person would know that he is violating clearly established law.  Rather,

20   when the law has been specifically defined to set the standards of conduct, factual situations

21   (assuming those disputed facts in plaintiff's favor) which clearly would violate those standards

22   preclude qualified immunity.  See Headwaters Forest Defense v. County of Humboldt, 276 F.3d

23   1125, 1131 (9th Cir. 2002).

24          Defendants argue that they violated no clearly established constitutional right,

25   conceding that while it is well-established that prison officials must provide inmates food that is

26   nutritionally adequate and prepared and served under conditions that do not endanger the health

1  and well being of the inmates who consume it, they maintain that no evidence shows defendants

2  violated this constitutional prohibition.  MSJ, p. 14.  Even if, defendants continue, the court

3  proceeds to the second part of the test, whether defendants could have reasonably believed their

4  conduct was lawful in light of the undisputed facts defendants should prevail because they

5  ostensibly 1) did not ignore any food service lapse and immediately took corrective action; 2)

6  defendants investigated and addressed inmate complaints about unsanitary conditions,

7  determining them to be unsubstantiated; and 3) no medical evidence supports inmate complaints

8  of a food-borne illness.   As to those defendants for whom the court finds that there is no Eighth

9  Amendment issue, the court need not reach the qualified immunity argument.  However, the

10  court finds that plaintiff has presented sufficient evidence to raise a genuine issue of material fact

11  as to whether or not the defendants Haythorne and Hague abdicated their responsibilities as food

12  manager and assistant food manager and violated plaintiff's right to food prepared and served

13  under constitutionally adequate conditions and further has put forth sufficient evidence to

14  undermine defendants' claim that they did not virtually ignore the plethora of complaints about

15  the unsanitariness of food service and preparation for a prolonged period and that any corrective

16  measures were either timely or adequate.

17
18
19
20
> Credibility determinations, the weighing of the evidence, and the
> drawing of legitimate inferences from the facts are jury functions,
> not those of a judge, whether he is ruling on a motion for summary
> judgment or for a directed verdict.  The evidence of the non-
> movant is to be believed, and all justifiable inferences are to drawn
> in his favor.

21  Anderson v. Liberty Lobby, Inc., supra, at 255,106 S. Ct. at 2513

22  Therefore, the court finds defendants Haythorne and Hague have not made an

23  adequate showing of entitlement to qualified immunity on this record.

24  Accordingly, IT IS HEREBY RECOMMENDED that defendants' motion for

25  summary judgment, filed on January 30, 2009 (docket # 105), be granted in part and denied in

26  part, as follows:

1.   Granted as to defendants Malfi, Leiber, Rodriguez, Ruller, Arndt, Baughman, Bernardino, Kelly and Smith;

2.   Granted as to (Acting) Warden Walker, in his individual capacity;

3.   Denied as to defendants Haythorne, and Hague; and

4.   Denied as to defendant Walker, in his official capacity only.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 06/16/09

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

GGH:009
jack2023.msj